IN THE FEDERAL DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LAITH SAUD,<br><br>Plaintiff,<br><br>v.<br><br>DEPAUL UNIVERSITY, KAREN TAMBURRO, and MARLA MORGEN<br><br>Defendants. | Case No.: 19-cv-3945 |

**COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff LAITH SAUD, by and through undersigned counsel, complaining of Defendants DEPAUL UNIVERSITY, KAREN TAMBURRO, and MARLA MORGEN for violations of Plaintiff's constitutionally protected rights under 42 U.S.C. § 1983, breach of contract, breach of fiduciary duties, promissory estoppel, and false light invasion of privacy. In support of these claims, Plaintiff states as follows:

**INTRODUCTION**

1. This case is about Defendants, a large private university with millions of dollars at its disposal and its employees, throwing an unprotected employee under the bus to further the university's own legal and public relations interest. Defendants in this case, at every stage of the facts in question, misled the Plaintiff, deprived him of good faith dealing and cooperation, colluded with one another to ruin his reputation, and abused his due process rights in order to protect the university.

1

2. Plaintiff was a popular lecturer at Defendant DePaul University ("DePaul") for approximately twelve (12) years. In 2017, Plaintiff was falsely accused of sexual assault. The accusations were proven false such that Plaintiff was exonerated in court and won a defamation claim against his accuser. The accuser's pleadings were contrived in such a way so as to make Defendant DePaul University a party to the suit. In the process of litigating that suit, DePaul promised to indemnify and defend Plaintiff, only to dump him the moment it was dismissed from the lawsuit, abruptly leaving him without legal representation. Defendants also contrived a false Title IX report in order to protect the legal and public relations interests of DePaul, in direct violation of federal guidelines on such investigations. In fact, in the process of contriving this report, Defendants did not once speak with Plaintiff's accuser, nor with anyone with direct knowledge of her allegations. Finally, Defendants placed Plaintiff in false light by publishing an article in DePaul's newspaper that recklessly repeated the false accusations when Defendants knew or should have known from their own records and other information at their disposal that such claims were false.

3. While Plaintiff was ultimately exonerated by a trial court in the Circuit Court of Cook County, significant damage was done to him as a direct and proximate cause of Defendants' acts and omissions. Defendants, both individually and together in collusion, worked to undermine and deprive Plaintiff of his constitutionally-protected rights, at the expense of their duties to Plaintiff, and at expense of the truth.

## JURISDICTION AND VENUE

4. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This action is brought in part pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of

the Plaintiff's rights as secured by the United States Constitution, among other counts asserted.

5. Venue is proper under 28 U.S.C. § 1391(b). The parties reside and/or conduct business in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district as well

## THE PARTIES

6. Plaintiff LAITH SAUD ("Plaintiff") is a resident of Chicago, Illinois. For twelve (12) years, Plaintiff was employed to teach in the Religious Studies department at Defendant DePaul University.

7. Defendant DEPAUL UNIVERSITY ("DePaul") is a private university organized under the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ *et seq*. At all times relevant hereto, DePaul was an educational institution receiving federal funding, and subject to Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.*

8. Defendant MARLA MORGEN ("Defendant Morgen") is sued in her official and individual capacity. At all times relevant hereto, Defendant Morgen was employed as Senior Associate General Counsel at DePaul. In this capacity, Defendant Morgen advised DePaul on certain matters pertaining to Plaintiff, which, as elaborated upon below, deprived Plaintiff of his constitutional rights and breached contractual and fiduciary duties owed to him.

9. Defendant Karen Tamburro ("Defendant Tamburro") is sued in her official and individual capacity. At all times relevant hereto, Defendant Tamburro was employed as the Title IX Coordinator at DePaul. In this capacity, Defendant Tamburro was responsible for overseeing DePaul's Title IX compliance, which included conducting investigations of complaints of alleged violations of DePaul's Title IX enforcement policy. One such

investigation involved depriving Plaintiff of his constitutional rights, as is elaborated upon below.

## FACTUAL ALLEGATIONS

### *Background*

10. Plaintiff was hired as an adjunct lecturer at DePaul in or around 2005. Plaintiff taught primarily in the Religious Studies Department. Plaintiff's classes were extremely popular, and there were often a number of students on a waitlist to enroll into his courses.

11. In part because of his success in bringing up enrollment in the Religious Studies Department, in or around 2010, Plaintiff was promoted to Visiting Assistant Professor ("VAP"). The VAP contract was renewed each academic term after a review of Plaintiff's performance. Plaintiff routinely received exceptional student and faculty evaluations.

12. Plaintiff's teaching philosophy emphasized in-class lectures and robust discussions, as opposed to emphasizing papers or exams. As a result, Plaintiff had an open policy wherein all students who attended and participated in the course received an A grade.

13. Throughout the course of his employment at DePaul, Plaintiff was a graduate student pursuing his PhD at the University of Chicago. He needed to work while pursuing his doctorate in part because Plaintiff is a single father. Plaintiff was told by the department on numerous occasions that if he obtained his PhD, Plaintiff would be given a senior position.

14. In the Spring of 2017, amidst budget cuts, Plaintiff was going to be moved to another department to avoid laying him off.

15. Meanwhile, because he was so economically important to the Religious Studies department, teaching the most popular classes in the department, the Chair of the Religious Studies Department invited him to adjunct and told Plaintiff to propose his own salary.

### *Former Student Falsely Accuses Plaintiff, Sparking Title IX Investigation*

16. During the Spring of 2017, Plaintiff received an attorney's lien letter from an attorney representing a former student. The letter advised there was a claim against Plaintiff "with regards to repeated acts of sexual misconduct and reckless behavior involving a student taking one of [Plaintiff's] classes." The letter did not provide any detail regarding the alleged acts of the Plaintiff.

17. Sometime in or around May of 2017, Plaintiff was informed that DePaul was investigating him for the alleged sexual misconduct. The investigation was conducted by Defendant Tamburro.

18. Plaintiff immediately informed the Chair of the Religious Studies Department, Khaled Keshk, that he was being investigated.

19. In early May of 2017, Plaintiff met with Defendant Tamburro. Plaintiff was not informed of any specific allegations against him. During this meeting, Plaintiff informed Defendant Tamburro that he had a consensual relationship with the former student, and that the former student had gotten upset with him in February of 2017 (nearly a year after she had taken his course) when he didn't respond to her text messages within a day. He further informed Defendant Tamburro that he never used his position for sexual favors, and that he gave out As to all students who attended and participated in his course.

20. Plaintiff was also asked about another female student. Defendant Tamburro told Plaintiff the female student had not complained about Plaintiff. Rather, Defendant

5

Tamburro's office received a report from a male student about allegedly inappropriate conduct with the female student. Defendant Tamburro interviewed the female student about whom the report was made, and the female student expressly denied that Plaintiff had ever made her feel uncomfortable.

21. Plaintiff also emailed Defendant Tamburro sometime in or around June of 2017, saying he believed he was the victim of misconduct by the former student because he was being used as a conduit for her to sue DePaul.

22. Defendant Tamburro attempted to contact the former student, both directly and through her attorneys. Neither the former student, nor her attorneys, cooperated with the investigation or provided further detail regarding the alleged sexual misconduct.

23. Sometime in May 2017, Defendant Tamburro completed her investigation and issued a report finding Plaintiff did not violate any of DePaul's policies.

24. At all times relevant, DePaul did not have a policy prohibiting romantic relationships between students and faculty.

***DePaul offers Plaintiff to teach courses as an adjunct for the upcoming academic year***

25. Plaintiff informed the Chair of his department, Keshk, regarding the findings. Keshk congratulated Plaintiff in a text message.

26. Keshk and Plaintiff spoke about Plaintiff continuing to teach in Religious Studies as an adjunct for the upcoming academic year. Keshk offered to have Plaintiff teach as an adjunct in the upcoming year, and Plaintiff accepted. Keshk told Plaintiff to email him a proposed salary, and that Keshk would obtain approval for that amount from the Dean of the college. Plaintiff emailed a proposed a salary to adjunct for the upcoming year, basing it on his years of experience and high class enrollment.

27.     Upon information and belief, DePaul gives a higher rate of pay to adjuncts with more teaching experience.

### *Former student files lawsuit against Plaintiff and DePaul, DePaul agrees to defend and indemnify Plaintiff*

28.     On June 29, 2017, the former student filed a lawsuit naming DePaul and Plaintiff as defendants. Against Plaintiff, she alleged common law battery and violation of the Illinois Gender Violence Act ("GVA"). Against DePaul, she alleged negligent hiring and supervision.

29.     The former student's lawsuit alleged that Plaintiff had been the subject of "many complaints of harassment" at DePaul, and that DePaul knew or should have known that Plaintiff was engaging in sexual misconduct.

30.     Against Plaintiff, the former student alleged that on a certain night, Plaintiff picked her up from the DePaul campus, took her out for dinner and drinks, "plied her with alcohol", and then took her back to his apartment where he "forcibly" pursued sex with her, twice. She also alleged a separate incident in Plaintiff's office at DePaul, where she claimed Plaintiff coerced her into touching herself.

31.     A couple of weeks later, Defendant Morgen contacted Plaintiff and informed him that, pursuant to the terms of the faculty handbook, DePaul would indemnify and defend Plaintiff. DePaul selected Plaintiff's attorneys for him. DePaul and Plaintiff also entered into a Joint Defense Agreement ("JDA"). Among the terms was a requirement of written notice to the other party when one party wanted to terminate the JDA.

### *DePaul re-opens investigation, withdraws offer to adjunct*

32.     Shortly after the former student filed her lawsuit, Defendant Tamburro reopened her investigation regarding the former student's claims.  Once again, neither the former student nor her attorneys cooperated with the investigation.

33.     Also shortly after the lawsuit was filed, DePaul abruptly withdrew its offer to have Plaintiff teach as an adjunct in the upcoming academic year.

34.     Defendant Tamburro issued a second report in October of 2017.  Without any change in the evidence, Defendant Tamburro changed her findings in the second report.  While she still maintained that a preponderance of the evidence did not support a finding that Plaintiff committed battery or abused his position, she found that he had sexually harassed the former student.  Defendant Tamburro's methods and findings failed to adhere to federal guidelines on conducting Title IX investigations.

35.     Following Defendant Tamburro's report, DePaul sent Plaintiff a letter stating that he was not eligible for future employment at DePaul, and no longer allowed to participate in any DePaul sponsored events, nor in any events co-sponsored by DePaul.

36.     Plaintiff asked Defendant Tamburro whether she would change her findings if evidence was later obtained that negated the former student's allegations.  Defendant Tamburro did not respond.

### *DePaul is dismissed from the lawsuit, stops defending Plaintiff, and publishes article in the university's newspaper regarding the case.*
### *Meanwhile, Plaintiff wins the lawsuit on his own.*

37.     Plaintiff filed his verified Answer to the former student's complaint.  Specifically, he denied ever using his position or grades for sexual favors, and denied that the encounters

alleged by the former student ever took place. Plaintiff also countersued the former student for defamation.

38. DePaul was first dismissed without prejudice from the lawsuit on the basis that an employer could not be held vicariously liable for sexual assault by an employee. The former student was given leave to file an Amended Complaint, and did. Defendant DePaul was again dismissed on the same basis, this time with prejudice.

39. Shortly after its dismissal from the lawsuit, on April 2, 2018 the DePaulia, DePaul's newspaper, published an article about the former student's allegations. The article was entitled, "Power Player: Former DePaul student sues ex-professor for sexual coercion." DePaulia journalists had been investigating the story for several months, were given access to Plaintiff's student lists and student contact information, and only published the story after DePaul was dismissed from the lawsuit.

40. The article was posted on the DePaulia website. The article was also "pinned" on the DePaulia's Twitter account for several months, which meant that it appeared at the top of the twitter page regardless of subsequent articles posted by the paper.

41. The article quoted a student who claimed she was in the same class as the former student that had filed the lawsuit. The student stated of the lawsuit, "That's not surprising to hear about him," and made other negative comments about Plaintiff's professionalism. In fact, this student was not actually in any class with Plaintiff and the former student that had filed the lawsuit. The article also generally discussed whether it was appropriate for students and faculty to date (students polled were split almost in half), but the article did not discuss any other faculty members, past or present.

42. The article also quoted Carol Hughes, Executive Director of Strategic Content and Media at DePaul, who told the DePaulia that Plaintiff was "not currently employed at DePaul" and would not comment on the reason he had left. DePaul administrators also made no comment in the article regarding the fact that Plaintiff was never the subject of "many complaints" of harassment at the university, as had been alleged by the former student. This and several of the former student's other false allegations were merely repeated throughout the article without rebuttal, even though DePaul knew or had reason to know of their falsity. The article made no mention of Plaintiff's countersuit for defamation either.

43. Upon information and belief, DePaulia journalists were in communication with DePaul administration, including Defendant Morgen, regarding what content to include in the article, whom to speak with, and when to publish it.

44. The same day that the article regarding Plaintiff was published, April 2, 2018, news also broke of a National Collegiate Athletic Association ("NCAA") investigation into DePaul's athletic department for violating NCAA rules and regulations. Upon information and belief, the DePaulia article regarding Plaintiff, "Power Player", was strategically titled so as to redirect some of the media attention the school would receive regarding the NCAA investigation. As mentioned earlier, the article about the Plaintiff was pinned on the DePaulia twitter account for several months after it was published. Upon information and belief, no other article posted on the DePaulia's Twitter page was pinned for that length of time.

45. In the meantime, the former student filed a Notice of Appeal of DePaul's dismissal in her case. DePaul then settled with the former student. DePaul also pressured

10

Plaintiff to settle. Plaintiff refused, maintaining that the lawsuit was baseless. DePaul then informed Plaintiff, via Defendant Morgen, that it would no longer defend or indemnify him.

46. DePaul never notified Plaintiff that it was terminating the JDA, but also never responded to Plaintiff's communications after it had been dismissed from the lawsuit.

47. The case proceeded to trial. Because he could not afford to pay the attorneys DePaul had obtained for him, Plaintiff was forced to proceed *pro se* until he found counsel to represent him. Plaintiff obtained evidence that negated the former student's version of events entirely, showing conclusively the events she had alleged could not have occurred. The former student's attorneys argued that regardless of whether the specifically alleged sexual encounters occurred, the former student was incapable of consenting to the romantic relationship due to the fact that Plaintiff was employed as her instructor. Throughout the course of the litigation, Plaintiff maintained that the former student's complaint was baseless, the events alleged never occurred, he never abused his position, and the pair had a consensual relationship. Plaintiff also moved for sanctions against the former student and her attorneys pursuant to Illinois Supreme Court Rule 137.

48. A bench trial was held on the matter on April 15-16, 2019. During the bench trial, Defendant Tamburro and Keshk testified. The two contradicted one another regarding sources of information used in Defendant Tamburro's second report, which she used to change her finding with respect to whether Plaintiff violated DePaul's policy on sexual harassment. Keshk testified he learned of Plaintiff's alleged misconduct through Defendant Tamburro's report, whereas Defendant Tamburro testified she obtained information from Keshk to substantiate her findings.

49. The trial judge denied all of the former student's claims against Plaintiff, finding the sexual encounter she had alleged never took place and Plaintiff did not abuse his position (the former student admitted Plaintiff never threatened or offered her anything in exchange for sex). She also granted Plaintiff's defamation claim against the former student.

*Plaintiff's damages*

50. Plaintiff has not been permitted to return to teach at DePaul.

51. The DePaulia article remains on the first page of search results when conducting a Google search of Plaintiff's name.

52. Plaintiff had been invited to lecture at classes at DePaul, but could not, due to the restrictions imposed on him by DePaul.

53. Plaintiff has applied for other academic positions, but has not received requests for interviews or any offers of employment. In some cases, Plaintiff has been directly told that news of the former student's lawsuit is the reason that he has not been considered for employment.

54. Sometime in 2017, Plaintiff had a one-man show in production with a Chicago theater company. Following the publication of the DePaulia article, the theater company informed Plaintiff that it learned of the lawsuit through the DePaulia article and could not work with Plaintiff as a result.

55. Throughout his career at DePaul, Plaintiff was also a frequent guest on local news and radio. Following the DePaulia article, the Plaintiff's relationship with local news contacts was damaged, and he was no longer sought out for his commentary.

56. In 2016, Plaintiff performed a TedX talk at DePaul. Following publication of the DePaulia article, DePaul removed Plaintiff's TedX talk from its YouTube channel and other media platforms.

57. The aforementioned caused Plaintiff to be without employment for over two (2) years and counting, severely impacting his ability to provide for his daughter as a single father. It also negatively impacted Plaintiff's professional standing and reputation, destroying his academic career. All of this has deeply and severely impacted Plaintiff's emotional health and well-being.

## COUNT I
## 42 U.S.C. § 1983 – Substantive and Procedural Due Process

58. Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

59. As described more fully above, Defendant DePaul and each of the other named defendants, acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to substantive and procedural due process. Defendants failed to provide Plaintiff with any of the procedural due process guarantees to which he was entitled, including, but not limited to, when it made an adverse credibility determination against Plaintiff and in favor of the accuser when Defendants never even spoke to either party during the second round of the investigation, and never spoke to the accuser at any point at all during the course of events.

60. Plaintiff had several cognizable property and liberty interests at issue, including, but not limited to: a property interest in his right to be defended and indemnified by DePaul; a property interest in his legitimate expectation of continued employment at DePaul; a liberty

interest in his right to pursue the occupation of his choice; a liberty interest in participating in academic events; and a liberty interest in his right to privacy and to free association.

61. Defendants violated Plaintiff's rights when, under color of law by the authority it had under Title IX, 20 U.S.C. § 1681 *et seq.*, it deprived Plaintiff of the due process guaranteed by the 14th Amendment of the United States Constitution.

62. Notwithstanding his eventual exoneration, Plaintiff's life has been severely damaged by Defendants' misdeeds. This includes, but is not limited to: Defendants improperly caused Plaintiff to lose his offer of employment at DePaul; Defendants caused Plaintiff to lose opportunities to participate in events sponsored or cosponsored by DePaul, which would have furthered his academic career; Defendants published false statements contained in the former student's lawsuit and offered nothing by way of information then known that could have mitigated against the damage to his reputation; and Defendants abruptly ended the defense and indemnification of Plaintiff in bad faith. All of this was done while Plaintiff faced some of the most serious accusations a person can face, accusations that turned out to be frivolous.

63. Defendants, acting under the color of law, deprived Plaintiff of his constitutionally protected due process rights in order to protect DePaul's own legal and public relations interests. Defendants' misconduct was objectively unreasonable and undertaken in bad faith and/or with willful indifference to Plaintiff's rights.

64. As a result of this violation, Plaintiff suffered injuries, including, but not limited to, actual damages and emotional distress, as more fully described above.

14

## COUNT II
### Breach of Contractual Obligation to Defend and Indemnify

65. Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

66. As described more fully above, DePaul owed a duty to defend and indemnify Plaintiff to the fullest extent permitted by the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ *et seq.*, as established under Article XI of DePaul's faculty handbook.

67. DePaul breached its duty to Plaintiff when, after agreeing to defend and indemnify Plaintiff and beginning performance on said agreement, it terminated his defense without cause.

68. DePaul's breach caused Plaintiff damage, including, but not limited to, having to bear the costs of his defense while unemployed.

## COUNT III
### Breach of Fiduciary Duties / Defense and Indemnification

69. Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

70. Defendants DePaul and Morgen owed a fiduciary duty to defend and indemnify Plaintiff, to the fullest extent permitted by the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ *et seq.*, as established under Article XI of DePaul's faculty handbook.

71. As elaborated further above, Defendants violated their fiduciary duties to act in good faith and to deal fairly with Plaintiff when Defendants placed DePaul's legal and public relations interests above their fiduciary duties to Plaintiff, and stopped indemnifying and defending him.

15

72. Defendants' breach of fiduciary duty to Plaintiff caused him damage including, but not limited to, having to bear the cost of defense while unemployed.

### COUNT IV – Breach of Employment Contract

73. Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

74. Defendant DePaul offered Plaintiff employment to teach as an adjunct for the upcoming academic year, and Plaintiff accepted. The terms of this contract were specific with respect to duration and the duties to be performed.

75. Defendant DePaul breached this contract when it informed Plaintiff that he could not adjunct.

76. Defendant DePaul's breach caused Plaintiff damage, as more fully described above.

### COUNT V – Breach of Fiduciary Duty in Employment Contract

77. Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

78. As elaborated further above, Defendant DePaul violated its fiduciary duty to act in good faith and to deal fairly with Plaintiff when Defendant told Plaintiff he could adjunct in the upcoming year and also told him to propose his own salary to adjunct, and then used the proposed salary as a basis to deny Plaintiff employment as an adjunct. As described more fully above, DePaul's real motivation for the breach was to protect its own legal and public relations interests.

79. Defendants' breach of fiduciary duty caused Plaintiff damage including, but not limited to, that he was not employed in the upcoming year, as more fully described above.

### COUNT VI – Promissory Estoppel

80.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

81.     Defendant DePaul made an unambiguous promise that Plaintiff could adjunct in the next academic year and told Plaintiff he could request a higher pay based on his years of experience at DePaul.

82.     Plaintiff's reliance on DePaul's promises was expected and foreseeable.

83.     Plaintiff relied on the promises to his detriment when he proposed a pay rate he thought would be fair, and DePaul later used this as a basis to deny him employment as an adjunct, causing him damage, as more fully described above.

### COUNT VII – False Light Invasion of Privacy

84.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

85.     As described more fully above, Defendants DePaul, Tamburro and Morgen, along with other unnamed DePaul faculty and staff, colluded to place Plaintiff in a false light to the public by way of the article published in the DePaulia newspaper. The false light imputed upon Plaintiff the commission of a crime, as well as conduct that would impute upon his professional integrity, and thus would be highly offensive to a reasonable person. Defendants acted with knowledge that the statements were false or with reckless disregard for whether the statements were true or false.

86.     Defendants determined when to publish the article about Plaintiff, and ultimately approved all of the information that was included, and excluded, from the article. Statements that placed Plaintiff in a false light include, but are not limited to: including the former

student's false claim, unrebutted, that Plaintiff was the subject of "many complaints" of harassment, when Defendants knew or should have known the statement was false; quoting a student that was not even in the same class as the former student (while claiming she was) who then commented negatively on Plaintiff's professionalism; and omitted the fact that Plaintiff had filed a defamation claim and provided no legal updates on the case, even though it kept the article pinned on its Twitter account for several months after it was published.

87. Defendants' conduct caused Plaintiff damage, including, but not limited to, loss of professional and economic opportunities and significant damage to his professional reputation.

## CONCLUSION

WHEREFORE, Plaintiff LAITH SAUD prays the Honorable Court enter judgment in his favor and against Defendants DEPAUL UNIVERSITY, KAREN TAMBURRO and MARLA MORGEN, and grant him the following relief:

a. Actual damages;
b. Compensatory damages;
c. Punitive damages with respect to Counts I, III, V and VII;
d. Costs;
e. Attorney's fees;
f. Injunctive relief ordering Defendant DePaul University to remove its ban on Plaintiff from applying for future employment opportunities and participating in DePaul sponsored and co-sponsored events;
g. Injunctive relief ordering Defendant DePaul University to remove the article about Plaintiff from any university affiliated websites and media platforms; and

    h.    Such other relief as the Court deems just and equitable.

                              Respectfully submitted,
                              LAITH SAUD
                              Plaintiff

                              _____/s/Christina Abraham_____
                              By:    Christina Abraham
                                    Attorney for Plaintiff

June 12, 2019

Attorney No. 6298946
Christina Abraham, Esq.
Attorney for Plaintiff
161 N. Clark Street, Suite 1600
312-588-7150