**IN THE FEDERAL DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

LAITH SAUD,

Plaintiff,

v.

DEPAUL UNIVERSITY, KAREN
TAMBURRO, and MARLA MORGEN

Defendants.

Case No.: 19-cv-3945

Hon. Judge Robert M. Dow, Jr.

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff LAITH SAUD, by and through undersigned counsel,

complaining of Defendants DEPAUL UNIVERSITY, KAREN TAMBURRO, and MARLA

MORGEN for violations of Plaintiff's statutorily and constitutionally protected rights under 42

U.S.C. § 1983, 20 U.S,C. § 1681 *et seq.*, 42 U.S.C. § 1981, breach of contract, breach of

fiduciary duties, promissory estoppel, and false light invasion of privacy. In support of these

claims, Plaintiff states as follows:

### INTRODUCTION

1.      This case is about Defendants throwing an unprotected employee under the bus to

further the university's own legal and public relations interest. Defendants in this case, at

every stage of the facts in question, misled the Plaintiff, deprived him of good faith dealing

and cooperation, colluded with one another to ruin his reputation, discriminated against him

1

on the basis of his gender and heritage, and abused his due process rights in order to protect the university.

2.     Plaintiff was a popular lecturer at Defendant DePaul University ("DePaul") for approximately twelve (12) years.  In 2017, Plaintiff was falsely accused of sexual assault. The accusations were proven false such that Plaintiff was exonerated in court and won a defamation claim against his accuser.  The accuser's pleadings were contrived in such a way so as to make Defendant DePaul University a party to the suit.  In the process of litigating that suit, DePaul promised to indemnify and defend Plaintiff, only to dump him after it was dismissed from the lawsuit, abruptly leaving him without legal representation.  Defendants also contrived a false Title IX report in order to protect the legal and public relations interests of DePaul, in direct violation of federal guidelines on such investigations.  In fact, in the process of contriving this report, Defendants did not once speak with Plaintiff's accuser, nor with anyone with direct knowledge of her allegations, including her attorneys.  Further, the accuser never filed a Title IX complaint at all, and ignored completely a claim of sexual misconduct made by Plaintiff.  Finally, Defendants placed Plaintiff in false light by publishing an article in DePaul's newspaper that recklessly repeated the false accusations when Defendants knew or should have known from their own records and other information at their disposal that such claims were false.  These and other actions described more fully below indicate Defendants acted with improper motivations, including discriminatory motives on the basis of Plaintiff's gender and race/ethnicity.

3.     While Plaintiff was ultimately exonerated by a trial court in the Circuit Court of Cook County, significant damage was done to him as a direct and proximate cause of Defendants' acts and omissions.  Defendants, both individually and together in collusion,

worked to undermine and deprive Plaintiff of his rights, at the expense of their duties to Plaintiff, and at expense of the truth. Finally, DePaul maintained a Joint Defense Agreement, through and up to trial, to only, at trial, attempt to subvert his defense.

## JURISDICTION AND VENUE

4.     This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This action is brought in part pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution, 20 U.S.C. § 1681 for sex discrimination during the course of a Title IX investigation, and 42 U.S.C. § 1981 for racial discrimination in employment, among other counts asserted.

5.     Venue is proper under 28 U.S.C. § 1391(b). The parties reside and/or conduct business in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district as well

## THE PARTIES

6.     Plaintiff LAITH SAUD ("Plaintiff") is a resident of Chicago, Illinois. For twelve (12) years, Plaintiff was employed to teach in the Religious Studies department at Defendant DePaul University.

7.     Defendant DEPAUL UNIVERSITY ("DePaul") is a private university organized under the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ *et seq*. At all times relevant hereto, DePaul was an educational institution receiving federal funding, and subject to Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.*

8.     Defendant MARLA MORGEN ("Defendant Morgen") is sued in her official and individual capacity. At all times relevant hereto, Defendant Morgen was employed as Senior Associate General Counsel at DePaul. In this capacity, Defendant Morgen advised DePaul

on certain matters pertaining to Plaintiff, which, as elaborated upon below, deprived Plaintiff of his constitutional rights and breached contractual and fiduciary duties owed to him.

9.    Defendant Karen Tamburro ("Defendant Tamburro") is sued in her official and individual capacity.  At all times relevant hereto, Defendant Tamburro was employed as the Title IX Coordinator at DePaul.  In this capacity, Defendant Tamburro was responsible for overseeing DePaul's Title IX compliance, which included conducting investigations of complaints of alleged violations of DePaul's Title IX enforcement policy. One such investigation involved depriving Plaintiff of his constitutional rights, as is elaborated upon below.

**FACTUAL ALLEGATIONS**

***Background***

10.    Plaintiff is male of Arab heritage.

11.    Plaintiff was hired as an adjunct lecturer at DePaul in or around 2005.  Plaintiff taught primarily in the Religious Studies Department.  Plaintiff's classes were extremely popular, and there were often a number of students on a waitlist to enroll into his courses.

12.    In part because of his success in bringing up enrollment in the Religious Studies Department, in or around 2010, Plaintiff was promoted to Visiting Assistant Professor ("VAP").  The VAP contract was renewed each academic term after a review of Plaintiff's performance.  Plaintiff routinely received exceptional student and faculty evaluations.

13.    Plaintiff's teaching philosophy emphasized in-class lectures and robust discussions, as opposed to emphasizing papers or exams.  As a result, Plaintiff had an open policy wherein all students who attended and participated in the course received an A grade.

4

14.     Throughout the course of his employment at DePaul, Plaintiff was a graduate student pursuing his PhD at the University of Chicago.  He needed to work while pursuing his doctorate in part because Plaintiff is a single father.  Plaintiff was told by the department on numerous occasions that if he obtained his PhD, Plaintiff would be given a senior position.

15.     In the Spring of 2017, Plaintiff and the only other VAP in the Religious Studies Department were informed that their positions were being shifted due to "budgetary constraints".  The other VAP was a white male.

16.     Plaintiff met with the Dean's office and was told he would be moved to another department.

17.     Meanwhile, because he was so economically important to the Religious Studies department, teaching the most popular classes in the department, the chair of the department, Khaled Keshk, invited Plaintiff to adjunct in Religious Studies.  Plaintiff accepted at the amount of $4,800 per course, and arrangements were being made for him to teach in the Fall.

18.     Plaintiff accepted the offer to adjunct in Religious Studies.  At minimum, Plaintiff would receive the base salary for adjuncts at DePaul, $4,800 per course taught.

19.     In June of 2017, in an email to Plaintiff and the other VAP in the department, Keshk invited them to propose bonus pay on the basis of "Enhanced Pay" – a program commonly used for senior adjunct faculty - and told them he would solicit those amounts from the dean of the college.

20.     Plaintiff responded to Keshk, proposing Enhanced Pay and providing his justifications for the proposed amount.  Plaintiff's proposal also did not reject the $4,800

base salary for new adjuncts, nor did he ever make Enhanced Pay a condition of his employment.

21.     Adjunct positions at DePaul (as with most universities) are limited-term contracts that expire at the end of the quarter or semester.  They are renewed as an adjunct begins teaching in a new quarter or semester.  Adjuncts at DePaul are paid per course.

22.     Upon information and belief, the other VAP in the department returned to work the next academic year as an adjunct, and remains employed by DePaul to date.

### *Former Student Falsely Accuses Plaintiff, Sparking Title IX Investigation*

23.     During the Spring of 2017, Plaintiff received an attorney's lien letter from an attorney representing a former student.  The letter advised there was a claim against Plaintiff "with regards to repeated acts of sexual misconduct and reckless behavior involving a student taking one of [Plaintiff's] classes."  The letter did not provide any detail regarding the alleged acts of the Plaintiff.

24.     Sometime in or around May of 2017, Plaintiff was informed that DePaul was investigating him for the alleged sexual misconduct.  The investigation was conducted by Defendant Tamburro.

25.     Plaintiff immediately informed his department chair, Keshk, that he was being investigated.  Keshk warned Plaintiff that he did not think Plaintiff would be treated fairly because he is a male of Arab heritage.

26.     In early May of 2017, Plaintiff met with Defendant Tamburro.  Plaintiff was not informed of any specific allegations against him.  During this meeting, Plaintiff informed Defendant Tamburro that he had a consensual relationship with the former student, and that the former student had gotten upset with him in February of 2017 (nearly a year after she had

6

taken his course) when he didn't respond to her text messages within a day. He further informed Defendant Tamburro that he never used his position for sexual favors, and that he gave out As to all students who attended and participated in his course.

27.     Plaintiff also emailed Defendant Tamburro sometime in or around June of 2017, saying he believed he was the victim of sexual misconduct by the former student because he was being used as a conduit for her to sue DePaul. Defendant Tamburro never responded to the email, nor did she open an investigation into Plaintiff's claim.

28.     Defendant Tamburro attempted to contact the former student, both directly and through her attorneys. Neither the former student, nor her attorneys, cooperated with the investigation nor provided further detail regarding the alleged sexual misconduct.

29.     Sometime in May 2017, Defendant Tamburro completed her investigation and issued a report finding Plaintiff did not violate any of DePaul's policies.

30.     At all times relevant, DePaul did not have a policy prohibiting romantic relationships between students and faculty.

31.     Plaintiff informed Keshk regarding the findings. Keshk congratulated Plaintiff in a text message. Keshk again congratulated Plaintiff the next time they saw one another in person.

***Former student files lawsuit against Plaintiff and DePaul, DePaul agrees to defend and indemnify Plaintiff***

32.     On June 29, 2017, the former student filed a lawsuit naming DePaul and Plaintiff as defendants. Against Plaintiff, she alleged common law battery and violation of the Illinois Gender Violence Act ("GVA"). Against DePaul, she alleged negligent hiring and supervision.

33.     The Chicago Sun Times published an article about the lawsuit, not naming Plaintiff by name, but noting the case involved DePaul University.  This sparked a petition from students, widely circulated on social media, in which several comments were made regarding Plaintiff's gender.  Upon information and belief, DePaul was aware and was motivated by the petition and these comments.  Defendant Tamburro, along with several other DePaul administrators, were sent the petition and had access to the comments made to it.

34.     The former student's lawsuit alleged that Plaintiff had been the subject of "many complaints of harassment" at DePaul, and that DePaul knew or should have known that Plaintiff was engaging in sexual misconduct.  In fact this claim was completely false, and it was her failure to provide specifics for this claim that later led to DePaul's dismissal from the case.

35.     Against Plaintiff, the former student alleged that on a certain night, Plaintiff picked her up from the DePaul campus, took her out for dinner and drinks, "plied her with alcohol", and then took her back to his apartment where he "forcibly" pursued sex with her, twice.  She also alleged a separate incident in Plaintiff's office at DePaul, where she claimed Plaintiff coerced her into touching herself.  The only fact alleged in support of her coercion claim was that Plaintiff was her instructor.

36.     A couple of weeks later, Defendant Morgen contacted Plaintiff and informed him that, pursuant to the terms of DePaul's Bylaws, DePaul would indemnify and defend Plaintiff.

37.     DePaul selected Plaintiff's attorneys for him and began paying for his defense.

38.     DePaul and Plaintiff's attorneys entered into a Joint Defense Agreement ("JDA"). Among the terms was a requirement of written notice to the other party when one party intended to terminate the JDA.

39.     Plaintiff was pressured to agree to the JDA because DePaul was indemnifying him and paying for his defense.  The JDA gave DePaul access to influence his defense and gain privy to otherwise privileged information, and to manage and control Plaintiff. Defendants took advantage of the JDA, all the way up until trial.

### *DePaul re-opens investigation, withdraws offer to adjunct*

40.     Shortly after the former student filed her lawsuit, Defendant Tamburro reopened her investigation regarding the former student's claims.  Once again, neither the former student nor her attorneys cooperated with the investigation.

41.     Also shortly after the lawsuit was filed, DePaul abruptly withdrew its offer to have Plaintiff teach as an adjunct in the upcoming academic year.

42.     Defendant Tamburro issued a second report in October of 2017.  Without any change in the evidence, Defendant Tamburro changed her findings in the second report. While she still maintained that a preponderance of the evidence did not support a finding that Plaintiff committed battery or abused his position, she found that he had sexually harassed the former student.  Defendant Tamburro's methods and findings failed to adhere to federal guidelines on conducting Title IX investigations or DePaul procedures.

43.     Upon information and belief, Defendant Tamburro was given access to information and documents from the case through Defendant Morgen.

44.     Following Defendant Tamburro's report, DePaul sent Plaintiff a letter stating that he was not eligible for future employment at DePaul, and no longer allowed to participate in any DePaul sponsored events, nor in any events co-sponsored by DePaul.

45.     Plaintiff was told that the investigation was closed and would not be reopened even if new evidence was obtained.  Plaintiff wrote a letter to the Dean of the college asking whether he could appeal the punitive measures imposed.  The Dean of the college informed Plaintiff that he could not appeal.

### *DePaul is dismissed from the lawsuit*

46.     Plaintiff filed his verified Answer to the former student's complaint.  Specifically, he denied ever using his position or grades for sexual favors, and denied that the encounters alleged by the former student ever took place.  Plaintiff also countersued the former student for defamation.

47.     DePaul was first dismissed without prejudice from the lawsuit on the basis that an employer could not be held vicariously liable for sexual assault by an employee.  The former student was given leave to file an Amended Complaint to plead more sufficient facts regarding their negligence claim against DePaul, and did.  In February of 2018, DePaul was again dismissed on the same basis, this time with prejudice, because the former could not plead sufficient facts that Plaintiff was the basis of any complaints of harassment.

### *DePaul publishes an article in the university's newspaper about the case*

48.     The DePaulia is DePaul's school newspaper, published through DePaul's College of Communication.  While the articles are written by student journalists, they are advised by faculty at DePaul's College of Communication.  DePaul's College of Communication also

offers a course, Writing for the DePaulia (JOUR390), in which students enroll in a course for credit and write stories for publication in the paper.

49.     On April 2, 2018, after its dismissal from the lawsuit, the DePaulia, published an article about the former student's allegations.  The article was entitled, "Power Player: Former DePaul student sues ex-professor for sexual coercion."

50.     DePaulia journalists had been investigating the story for several months.  They were given access to Plaintiff's student lists and student contact information by DePaul administrators.  Despite starting work on the article shortly after the former student's lawsuit was filed, the DePaulia only published the story after DePaul was dismissed from the lawsuit the following year.  The article repeated the completely baseless allegations contained in the former student's lawsuit, including that Plaintiff had been the subject of "many complaints of harassment" at DePaul, that he had "plied" the former student with alcohol, and that he used his position to coerce the former student into having sex with him.

51.     The article misrepresented Plaintiff's denials and statements in his filed pleadings, including that he denied going to dinner with the former student.

52.     Upon information and belief, one of the journalists working on the piece told one of the students interviewed that she believed DePaul was discriminating against Plaintiff because he was Arab and male.

53.     The article was posted on the DePaulia website.  The article was also "pinned" on the DePaulia's Twitter account for several months, which meant that it appeared at the top of the twitter page regardless of more recent articles published and "tweeted" by the paper. DePaul actively promoted the article until September of 2018.

54.     DePaulia journalists were given access to enrollment and contact information for students enrolled in Plaintiff's courses.  While they contacted several students, the article quoted only one student that purported to have been enrolled in the same class with Plaintiff and the former student that had filed the lawsuit.  In fact, the quoted student was not enrolled in the same class.  The article quoted this student, who made comments about how it seemed female students had more "intimate" relationships with Plaintiff than male students, and stated of the lawsuit, "That's not surprising to hear about him," and made other negative comments about Plaintiff's professionalism.

55.     The article also generally discussed whether it was appropriate for students and faculty to date (students polled were split almost in half). Despite the fact that dating between faculty and students occurs at DePaul and is not prohibited by the university, the article did not discuss any other faculty members or students, past or present, that had such relationships.

56.     The article also quoted Carol Hughes, Executive Director of Strategic Content and Media at DePaul, who told the DePaulia that Plaintiff was "not currently employed at DePaul" and would not comment on the reason he had left.  DePaul administrators also made no comment in the article regarding the fact that Plaintiff was never the subject of "many complaints" of harassment at the university, as had been alleged by the former student.  This and several of the former student's other false allegations were merely repeated throughout the article without rebuttal, even though DePaul knew or had reason to know of their falsity.

57.     The article made no mention of Plaintiff's countersuit for defamation.

58.     Plaintiff, on the advice of his DePaul-paid-for-attorneys, provided no statement to the DePaulia.  Nor did his attorneys.

59.     Upon information and belief, DePaulia journalists or advising faculty were in communication with DePaul administration regarding what content to include in the article, whom to speak with, and when to publish it.

60.     The same day that the article regarding Plaintiff was published, April 2, 2018, news also broke of a National Collegiate Athletic Association ("NCAA") investigation into DePaul's athletic department for violating NCAA rules and regulations.  Upon information and belief, the DePaulia article regarding Plaintiff, "Power Player", was strategically titled so as to redirect some of the media attention the school would receive regarding the NCAA investigation.  As mentioned earlier, the article about the Plaintiff was pinned on the DePaulia twitter account for several months after it was published.  Upon information and belief, no other article posted on the DePaulia's Twitter page was pinned for that length of time.

### *DePaul stops defending/indemnifying Plaintiff, and the case proceeds to trial*

61.     Following DePaul's dismissal in February of 2018, the former student filed a Notice of Appeal of DePaul's dismissal in her case.

62.     Sometime in April 2018, after the DePaulia article was published, DePaul settled with the former student.  DePaul also pressured Plaintiff to settle.  Plaintiff refused, maintaining that the lawsuit was baseless and had been filed in bad faith.  DePaul then informed Plaintiff, via Defendant Morgen, that it would no longer defend or indemnify him. DePaul provided no explanation to Plaintiff for its action.

63.     DePaul never notified Plaintiff that it was terminating the JDA.

64.     The case proceeded to trial.  Because he could not afford to pay the attorneys DePaul had obtained for him, Plaintiff was forced to proceed *pro se* until he found counsel to represent him *pro bono*.

65.     DePaul's attorneys later contacted Plaintiff's attorney to obtain updates, including when it was preparing to represent two of DePaul's faculty (Tamburro and Keshk) in depositions.

66.     Throughout the course of the litigation, Plaintiff maintained that the former student's complaint was baseless, the events alleged never occurred, he never abused his position, and the pair had a consensual relationship.  Plaintiff also moved for sanctions against the former student and her attorneys pursuant to Illinois Supreme Court Rule 137.

67.     Plaintiff obtained evidence that negated the former student's version of events entirely, showing through phone records, receipts and bank records that the events she had alleged could not have occurred.  A bench trial was held on the matter on April 15-16, 2019. An attorney from DePaul was present at the first day of trial.  The trial judge denied the former student's claims and granted Plaintiff's defamation claim.

68.     Despite the former student's initial denial that there had been a consensual relationship, the trial court found there to have been one due to numerous phone and text messages (most occurring after the course was over), and the former student's own admissions at trial.  More importantly, trial court found that on the night the former student alleged to have been assaulted by Plaintiff, while both parties admitted they went out for dinner, she and Plaintiff never went back to Plaintiff's home and had sexual intercourse at all.  The former student also admitted she only had two drinks that evening, and that the Plaintiff did nothing to force her to drink.  The former student also admitted Plaintiff never

offered her anything, nor threatened her, nor that there was even a *quid pro quo* arrangement between them.  Text messages between them showed the former student had gotten angry with the Plaintiff a few months before filing her lawsuit (and nearly a year after the course was over) when he did not respond to her text messages quickly enough.  This, among other testimony and evidence, allowed the trial court to enter its finding against the former student and for Plaintiff.

69.     The former student's attorneys argued repeatedly throughout the course of the litigation and at trial that regardless of whether the specifically alleged sexual encounters occurred, the former student was *incapable* of consenting to the romantic relationship due to the fact that Plaintiff was employed as her instructor.

70.     On day one of the bench trial, Defendant Tamburro and Keshk testified.  The two contradicted one another regarding sources of information used in Defendant Tamburro's October 2017 report, which she used to change her finding with respect to whether Plaintiff violated DePaul's policy on sexual harassment.  Among other inconsistencies, Keshk testified he learned of Plaintiff's alleged misconduct through Defendant Tamburro's report, whereas Defendant Tamburro testified she obtained information from Keshk to substantiate her findings.

71.     During discovery in the case, Plaintiff issued a subpoena to DePaul requesting, among other things, the former student's sign-in records at the dormitory where her friend lived.  The former student testified that, following the alleged assault, she went to her friend's dorm and was signed in at approximately 1am.  DePaul produced the requested sign-in records in response to the subpoena, which confirmed her sign in at that time. At trial, the former student's attorneys objected to the admission of the sign-in records as evidence,

arguing they were not self-authenticating. The trial judge agreed and, noting DePaul's attorney and someone from DePaul's Office of General Counsel was present in the courtroom, the judge requested Plaintiff to ask DePaul if they would authenticate the sign-in records. Plaintiff's attorney made the request to DePaul's attorney, and DePaul refused to cooperate. The trial judge ultimately allowed the evidence in with Plaintiff's own testimony authenticating the document.

72.     The trial judge denied all of the former student's claims against Plaintiff, finding the sexual encounter she had alleged never took place and Plaintiff did not abuse his position. The trial judge also granted Plaintiff's defamation claim against the former student.

### DePaul Acted under the Color of State Law

73.     DePaul receives grants and other financial assistance from the State of Illinois, including funding for projects and programs that benefit the university. DePaul is required to regularly report to the State regarding compliance with state-required ethical standards and legal compliance.

74.     This includes regular reporting to the State regarding allegations of sexual violence, and the steps taken by the university to address such allegations.

75.     DePaul boasts of its deep ties with the City of Chicago ("the City"). It received taxpayer funds from the City to build its basketball arena. The City's community college program shares building facilities with DePaul. DePaul also has an Admission Partnership Program with all of the City's colleges, including a "Dual Admission Partnership Program", which grants City community college students who meet only two minimum requirements guaranteed admission to DePaul.

76.     Upon information and belief, DePaul also receives preferential treatment from the City with respect to security services, traffic management, and access to coveted property, among other things.  For example, the City restricted traffic access to Jackson Ave from State Street at the location of DePaul's main Loop facilities, and implemented an all-way crosswalk – perhaps the only one of its kind in the Loop, if not the entire City.  The Chicago Police Department maintains around-the-clock patrol of DePaul's Loop and Lincoln Park campuses, such that DePaul has no need for a university police department that patrols the campus (unlike other private universities in the City, which have their own private police departments).

### *Plaintiff's damages*

77.     Plaintiff has not been permitted to return to teach at DePaul.  He has also not been permitted to participate in any activities sponsored or co-sponsored by the university.

78.     The DePaulia article remains on the first page of search results when conducting a Google search of Plaintiff's name.  The result of this has been devastating upon the Plaintiff, as it has rendered him unemployable to any employer with an internet search engine.

79.     Plaintiff had been invited to lecture at classes at DePaul, but could not, due to the restrictions imposed on him by DePaul.

80.     Plaintiff has applied for other academic positions, but has not received requests for interviews or any offers of employment.  In some cases, Plaintiff has been directly told that news of the former student's lawsuit is the reason that he has not been considered for employment.

81.     Sometime in 2017, Plaintiff had a one-man show in production with a Chicago theater company.  Following the publication of the DePaulia article, the theater company

informed Plaintiff that it learned of the lawsuit through the DePaulia article and could not work with Plaintiff as a result.

82.     Throughout his career at DePaul, Plaintiff was also a frequent guest on local news and radio.  Following the DePaulia article, the Plaintiff's relationships with local news contacts were damaged, and he was no longer sought out for his commentary.

83.     In 2016, Plaintiff performed a TedX talk at DePaul.  Following publication of the DePaulia article, DePaul removed Plaintiff's TedX talk from its YouTube channel and other media platforms.

84.     The aforementioned caused Plaintiff to be without employment for over two (2) years and counting, severely impacting his ability to provide for his daughter as a single father.  Despite the fact that Plaintiff, after spending ten (10) years pursuing his PhD at the University of Chicago and finally receiving it in December of 2017, the aforementioned also negatively impacted Plaintiff's professional standing and reputation, destroying his academic career.  All of this has deeply and severely impacted Plaintiff's emotional health and well-being.

**COUNT I**
**42 U.S.C. § 1983 – Substantive and Procedural Due Process**

85.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

86.     As described more fully above, Defendant DePaul and each of the other named defendants, acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to substantive and procedural due process.  Defendants failed to provide Plaintiff with any of the procedural due process guarantees to which he was entitled, including, but not limited to,

18

when it made an adverse credibility determination against Plaintiff and in favor of the

accuser when Defendants never even spoke to either party during the second round of the

investigation, and never spoke to the accuser at any point at all during the course of events.

87.     Plaintiff had several cognizable property and liberty interests at issue, including,

but not limited to: a property interest in his right to be defended and indemnified by DePaul;

a property interest in his legitimate expectation of continued employment at DePaul; a liberty

interest in his right to pursue the occupation of his choice; a liberty interest in participating in

academic events; and a liberty interest in his right to privacy and to free association.

88.     Defendants violated Plaintiff's rights when, under color of law by the authority it

had under Title IX, 20 U.S.C. § 1681 *et seq.*, it deprived Plaintiff of the due process

guaranteed by the 14th Amendment of the United States Constitution.

89.     Notwithstanding his eventual exoneration, Plaintiff's life has been severely

damaged by Defendants' misdeeds.  This includes, but is not limited to: Defendants

improperly caused Plaintiff to lose his employment at DePaul; Defendants caused Plaintiff to

lose opportunities to participate in events sponsored or cosponsored by DePaul, which would

have furthered his academic career; Defendants published false statements contained in the

former student's lawsuit and offered nothing by way of information then known that could

have mitigated against the damage to his reputation; and Defendants abruptly ended the

defense and indemnification of Plaintiff in bad faith.  All of this was done while Plaintiff

faced some of the most serious accusations a person can face, accusations that turned out to

be frivolous.

90.     Defendants, acting under the color of law, deprived Plaintiff of his

constitutionally protected due process rights in order to protect DePaul's own legal and

public relations interests.   Defendants' misconduct was objectively unreasonable and undertaken in bad faith and/or with willful indifference to Plaintiff's rights.

91.     As a result of this violation, Plaintiff suffered injuries, including, but not limited to, actual damages and emotional distress, as more fully described above.

**COUNT II**
**Title IX Discrimination**

92.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

93.     DePaul is an institution that receives federal funding and is subject to the provisions of Title IX of the Education Amendments Act of 1972, 20 USC § 1681 *et seq.*

94.     DePaul discriminated against Plaintiff on the basis of his gender, male, by denying him access to educational benefits and programs.  For example, DePaul did not investigate, nor even respond to, Plaintiff's report that he felt he had been the victim of sexual misconduct by the former student.  Plaintiff was also treated disparately in that DePaul issued a credibility determination in favor of the former student, and against Plaintiff, when it never actually spoke to the former student and she never actually filed a Title IX claim at all.  In addition, during the process of the Title IX investigation, DePaul violated Plaintiff's constitutional right to due process as more fully described above.

95.     Plaintiff was denied access to educational benefits and programs, including, but not limited to, that he was prohibited from future employment at DePaul, and that he was prohibited from participating in any DePaul-sponsored, or co-sponsored, events.

96.     Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

20

## COUNT III
## 42 U.S.C. § 1981 – Race/Ethnicity Discrimination

97.     Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

98.     Plaintiff is an Arab American.  He was qualified and performed his job excellently, as observed in student and faculty teaching evaluations over the years.  Plaintiff was the most popular teacher in the department, his courses were almost always full and students were waitlisted to attend his course.  Plaintiff and the only other VAP in the Religious Studies department, a white male, were both offered adjunct positions after they were informed of the budget cuts, and both were invited to request Enhanced Pay.  Plaintiff was treated disparately in that he was abruptly informed that he would not be brought back to adjunct, when the other similarly-situated colleague was brought back as an adjunct.

99.     Defendant's discriminatory conduct caused Plaintiff damages as more fully described above.

## COUNT IV
## Breach of Contractual Obligation to Defend and Indemnify

100.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

101.    As described more fully above, DePaul owed a duty to defend and indemnify Plaintiff.  First, it was required to do so to the fullest extent permitted by the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ *et seq.*, as established under Article XI of DePaul's Bylaws.  Also, DePaul itself took up the duty to defend and began substantial performance, even continuing said performance after it was dismissed from the lawsuit.

102.    DePaul breached its duty to Plaintiff when, after agreeing to defend and indemnify Plaintiff and substantially performing on said agreement, it terminated his defense without cause.

103.    DePaul's breach caused Plaintiff damage, including, but not limited to, having to bear the costs of his defense while unemployed.

**COUNT V**
**Breach of Fiduciary Duties / Defense and Indemnification**

104.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

105.    Defendants DePaul and Morgen owed a fiduciary duty to defend and indemnify Plaintiff, to the fullest extent permitted by the Illinois General Not for Profit Corporation Act, 805 ILCS 105/ *et seq.*, as established under Article XI of DePaul's Bylaws.

106.    As elaborated further above, Defendants violated their fiduciary duties to act in good faith and to deal fairly with Plaintiff when Defendants placed DePaul's legal and public relations interests above their fiduciary duties to Plaintiff, and stopped indemnifying and defending him.

107.    Defendants' breach of fiduciary duty to Plaintiff caused him damage including, but not limited to, having to bear the cost of defense while unemployed.

**COUNT VI – Breach of Employment Contract**

108.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

109.    Defendant DePaul offered Plaintiff employment to teach as an adjunct for the upcoming academic year, and Plaintiff accepted.  The terms of this contract were specific with respect to duration and the duties to be performed.  Plaintiff was to receive a minimum

of $4,800 per course. The adjuncting contract would have renewed each academic Quarter when new courses began.

110.    Defendant DePaul breached this contract when it informed Plaintiff that he would not be brought back to adjunct.

111.    Defendant DePaul's breach caused Plaintiff damage, as more fully described above.

### COUNT VII – Breach of Fiduciary Duty in Employment Contract

112.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

113.    As elaborated further above, Defendant DePaul violated its fiduciary duty to act in good faith and to deal fairly with Plaintiff when Defendant agreed to have Plaintiff adjunct in the upcoming year and also told him to request Enhanced Pay, and then used the Enhanced Pay request as a basis to deny Plaintiff employment as an adjunct. As described more fully above, DePaul's real motivation for the breach was to protect its own legal and public relations interests.

114.    Defendants' breach of fiduciary duty caused Plaintiff damage including, but not limited to, that he was not employed the next academic year, as more fully described above.

### COUNT VIII – Promissory Estoppel

115.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated fully herein.

116.    Defendant DePaul made an unambiguous promise that Plaintiff could adjunct in the next academic year and told Plaintiff he could request Enhanced Pay based on his years of experience at DePaul.

117.    Plaintiff's reliance on DePaul's promises was expected and foreseeable.

118.    Plaintiff relied on the promises to his detriment when he proposed Enhanced Pay

he thought would be fair, and DePaul later used this as a basis to deny him employment as an

adjunct, causing him damage, as more fully described above.

### COUNT IX – False Light Invasion of Privacy

119.    Plaintiff reasserts and realleges all previously pled paragraphs as if incorporated

fully herein.

120.    As described more fully above, Defendants DePaul, Tamburro and Morgen, along

with other unnamed DePaul faculty and staff, colluded to place Plaintiff in a false light to the

public by way of the article published in the DePaulia newspaper.  The false light imputed

upon Plaintiff the commission of a crime, as well as conduct that would impute upon his

professional integrity, and thus would be highly offensive to a reasonable person.

Defendants acted with knowledge that the statements were false or with reckless disregard

for whether the statements were true or false.

121.    Defendants determined when to publish the article about Plaintiff, and ultimately

approved all of the information that was included, and excluded, from the article.  Statements

that placed Plaintiff in a false light include, but are not limited to: including the former

student's false claim, unrebutted, that Plaintiff was the subject of "many complaints" of

harassment, when Defendants knew or should have known the statement was false; quoting a

student that was not even in the same class as the former student (while claiming she was)

who then commented negatively on Plaintiff's professionalism; and omitted the fact that

Plaintiff had filed a defamation claim and provided no legal updates on the case, even though

it kept the article pinned on its Twitter account for several months after it was published.

122.    Defendants' conduct caused Plaintiff damage, including, but not limited to, loss of professional and economic opportunities and significant damage to his professional reputation.

<u>**CONCLUSION**</u>

WHEREFORE, Plaintiff LAITH SAUD prays the Honorable Court enter judgment in his favor and against Defendants DEPAUL UNIVERSITY, KAREN TAMBURRO and MARLA MORGEN, and grant him the following relief:

a.  Actual damages;

b.  Compensatory damages;

c.  Punitive damages;

d.  Costs;

e.  Attorney's fees;

f.  Injunctive relief ordering Defendant DePaul University to remove its ban on Plaintiff from applying for future employment opportunities and participating in DePaul sponsored and co-sponsored events;

g.  Injunctive relief ordering Defendant DePaul University to remove the article about Plaintiff from any university affiliated websites and media platforms; and

h.  Such other relief as the Court deems just and equitable.


Respectfully submitted,
LAITH SAUD
Plaintiff


_____/s/Christina Abraham_____

By:    Christina Abraham
Attorney for Plaintiff

July 19, 2019

Attorney No. 6298946
Christina Abraham, Esq.
Attorney for Plaintiff
161 N. Clark Street, Suite 1600
312-588-7150