**IN THE FEDERAL DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| LAITH SAUD, | |
| Plaintiff, | Case No.: 1:19-cv-3945 |
| v. | Hon. Judge Robert M. Dow, Jr. |
| DEPAUL UNIVERSITY, KAREN TAMBURRO, and MARLA MORGEN | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION AND BACKGROUND**

Plaintiff brought this action alleging a § 1983 claim for substantive and due process violations, a Title IX claim for gender discrimination, and a § 1981 claim for race discrimination, along with supplemental state law claims for breach of duty to indemnify and defend, breach of employment contract, breach of fiduciary duties with respect to those duties, and false light invasion of privacy. He now seeks a preliminary injunction requiring Defendant DePaul University ("DePaul") to remove an article posted on the DePaulia website and Twitter account regarding Plaintiff and pertaining to his underlying case against DePaul.

The details of this case are elaborated in Plaintiff's Amended Complaint, as well as in the attached affidavit. Pl. Am. Compl., ECF No. 17; Exhibit A, Affidavit. Plaintiff was employed by DePaul for 12 years. Pl. Am. Compl., ¶ 2. He was a popular lecturer, with an impeccable record. *Id.*, ¶ 12. The Plaintiff also consistently received the highest employment reviews from his

1

superiors in the department. *Id.* In early 2017, a former student accused Plaintiff of sexual misconduct. *Id.*, ¶ 23. The accusations were proven false, such that a trial court denied his accuser's claims and granted Plaintiff's defamation counter-suit. *Id.*, ¶ 67. The accuser had sued both Plaintiff and DePaul; the pleadings were contrived in such a way so as to make DePaul a party to the suit. *Id.*, ¶ 32. DePaul promised to indemnify and defend Plaintiff (*Id.*, ¶ 36), but when it got itself dismissed from the lawsuit (*Id.*, ¶ 47), it stopped indemnifying and defending him, leaving Plaintiff without legal representation (*Id.*, ¶ 62). Defendants, after first clearing Plaintiff of any wrongdoing in its initial Title IX investigation, subsequently contrived a false Title IX report, which Plaintiff believes was motived by gender bias and in order to further DePaul's legal and public relations interests. *Id.*, ¶ 2. The new report implicated the Plaintiff in "harassing" his accuser; no explanation is given on how he harassed her or how he allegedly violated DePaul's harassment policy. Further, upon information and belief, by this time DePaul was fully aware that the accusations against the Plaintiff were false, possessing ample evidence demonstrating that the accuser was angry with the Plaintiff for not pursuing a serious relationship with her. *Id.* In the process of contriving the report, Defendants did not once speak with Plaintiff's accuser, nor did she ever make a Title IX complaint, nor was there any new evidence that differentiated the original report from the contrived report. *Id.*, ¶¶ 28, 40. The (female) accuser's accusations were accommodated without her cooperation or evidence, while the (male) Plaintiff's cooperation, evidence, and his own claim of being the target of sexual misconduct were summarily disregarded, without process. *Id.*, ¶ 27; Ex A, ¶ 5; Exhibit B, Email to Tamburro. The contrived report was a pretext that enabled DePaul to impose punishment upon Plaintiff, in that he was barred from seeking future employment at DePaul, and banned from any event sponsored or cosponsored by DePaul. *Id.*, 44. Later, Defendants were responsible for publishing an article in the school

newspaper, the DePaulia, which repeated the accusations of the accuser, unrebutted, and which disparaged Plaintiff's professionalism. *Id.*, 49; Exhibit C, 2018 DePaulia Article.

The article, which is the focus of this motion, was the first article to publicly link Plaintiff to the accuser's complaint. The false statements in the article include, but are not limited to: (1) that Plaintiff had been the subject of "many complaints" of harassment at DePaul, a statement DePaul knew was absolutely false (*Id.*, ¶ 50, 56); (2) it included the statements of a student that the article claimed was in the same class as the accuser, but who was in actuality not, to opine on the relationship between the accuser and the Plaintiff, when she in fact had no knowledge of the accuser at all, and to disparage the Plaintiff's professionalism (*Id.*, ¶ 54); (3) the article omitted the fact that Plaintiff had filed a defamation claim against his accuser (*Id.*, ¶ 57). Defendants exercised control over the article's publication: the journalists were given access to records that would not otherwise be available to them (*Id.*, 54, 59), DePaul administrators (including Defendant Tamburro) were quoted in the article (*Id.*, 56), and the article's publication was conveniently timed after DePaul was dismissed from the accuser's lawsuit and on the same day the NCAA announced it was investigating DePaul on an unrelated matter (*Id.*, ¶ 60).[1]

The article was posted and pinned on the DePaulia Twitter account. *Id.*, ¶ 53. Pinning is a form of promotion, pegging the article to the top of the DePaulia Twitter account's page, regardless of subsequent posts published on the account. The article remained pinned for at least five months. *Id.* To date, the article remains published on the DePaulia website and in Twitter posts. The article appears on the first page of a Google search of Plaintiff's name. Exhibit D, Pl. Google Search. As

---

[1] The title of the article is also intriguing, considering the news of the NCAA investigation that same day: "Power Player: Former DePaul Student sues ex-professor for sexual coercion", Ex. C. Compare with the first article published in the DePaulia shortly after the lawsuit was filed in 2017, which does not mention Plaintiff by name: "Lawsuit: student sues, alleging professor coerced her into sex", Exhibit F, 2017 Article.

3

a result, Plaintiff has been unable to obtain employment, and has even been told that the accusations reported in the article were the reason for the prospective employer's decision not to work with Plaintiff. Pl. Am. Compl., ¶ 80-81; Ex. A; Exhibit E, Email from Silk Road. So long as the article remains public, it interferes with Plaintiff's ability to move forward with his life and find meaningful employment.

**Legal Standard**

A party seeking injunctive relief must go through a two-step analysis to assess whether preliminary injunctive relief is warranted. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). First, the movant must make a threshold showing that (1) he will suffer irreparable harm absent the relief; (2) there is no adequate remedy at law; and (3) the movant has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). If the threshold is met, then the court considers (4) whether the balance of equities favors the movant, and (5) the effects, if any, that a grant or denial would have on third parties, such as the public interest. *Id.* at 662.

**1) Likely to suffer irreparable harm without preliminary relief**

The DePaulia article appears on the first page of a Google search of Plaintiff's name. Ex. D. Not only has it harmed Plaintiff, but it contains information and statements that DePaul knew were false. As he states in his Amended Complaint, he has been told by prospective employers that news of the accusations was the reason they could not work with him. The 2018 DePaulia article is the only article that discusses the lawsuit and mentions Plaintiff by name. Plaintiff has already been harmed by the article. Pl. Am. Compl., ¶¶ 77-84, Ex. A. If Plaintiff is not afforded preliminary relief at this stage, he will continue to suffer harm and be prevented from mitigating his damages by finding employment elsewhere.

4

**2) Plaintiff has no other adequate remedy at law**

An injunction is appropriate when there is "no adequate remedy at law." *Boucher v. School Bd.*, 134 F.3d 821, 823-2 (7th Cir. 1998). In this case, there is no remedy at law that would satisfy the irreparable harm the article continues to impose upon Plaintiff. It is the first thing a prospective employer sees when it looks up Plaintiff's name on the internet. It remains a constant barrier to Plaintiff in his search for meaningful employment.

**3) Plaintiff has a reasonable likelihood of success on the merits**

To justify relief, the movant must show a reasonable likelihood of success on the merits of the claim. *Goodman v. Ill. Dep't of Fin. Prof'l Regulation*, 430 F.3d 432, 438 (7th Cir. 2005). This has been described by the Seventh Circuit as a "better than negligible chance of succeeding on the merits." *Boucher v. School Bd.,* at 834. Plaintiff's complaint alleges nine counts, of which at least three address the publication of the DePaulia article and Twitter posting and pinning. With respect to his 1983 and Title IX claims, the article constituted an added punishment to an investigation that was improperly conducted, motivated by discriminatory intent, and that came to false conclusions.

For a § 1983 claim to be successful, a plaintiff must show that the defendant (1) acted under the color of law; (2) deprived plaintiff of a constitutionally protected cognizable property and/or liberty interest; and (3) said deprivation caused damage to the plaintiff. *Collins v. Bd. Of Educ.*, 792 F. Supp. 2d 992, 1000 (N.D. IL 2011). For a Title IX claim to be successful, a plaintiff must show that he/she was denied access to educational benefits and programs, from an educational institution receiving federal funding, on the basis of gender. *Doe v. Purdue,* 2019 U.S. App. LEXIS 19464, 31 (7th. Cir. 2019). Plaintiff's Amended Complaint alleges several facts to support

5

a showing that DePaul and the individually named defendants acted under the color of state or local law at the time of their conduct. *See*, Pl. Am. Compl., ¶¶ 73-76.

In this case, Plaintiff has a likelihood of success in showing Defendants violated his substantive and procedural due process rights, and discriminated against him on the basis of his gender, when: (1) they began a Title IX investigation but did not provide Plaintiff any information on the accuser's claim, such that he did not know what he was being investigated for allegedly having done (*Id.*, ¶ 26); (2) the accuser did not even initiate the Title IX complaint (*Id.*, ¶¶ 28, 40); (3) Defendants made a credibility determination in favor of the accuser when the accuser gave no statements (either directly or through her attorneys) to Defendants (*Id.*, ¶ 86); (4) they changed their findings after the accuser filed her lawsuit, when Defendants had no new evidence from which to actually base their changed findings (*Id.*, 42). This led Defendants to impose penalties on Plaintiff, including barring him from future employment at DePaul, banning him from participating in any events sponsored or even co-sponsored by DePaul (*Id.*, ¶ 44), and later publishing an article that publicly named Plaintiff (*Id.*, 49-60, Ex. C). The article repeated the false allegations of his accuser unrebutted, and disparaged Plaintiff's professionalism. All of this was done at the direction and control of DePaul. As Plaintiff's complaint points out, DePaul exercised control over when the article would be published, what resources journalists would have access to, and what content would be included in the publication. It even exercised control over Plaintiff's response, because at the time, DePaul was indemnifying Plaintiff, paying for his legal defense, and had a joint defense agreement in place with him. *Id.*, ¶¶ 39, 58.

Plaintiff's has a likelihood of success in showing that DePaul's conduct was motivated by gender bias. In support of this claim, Plaintiff alleges that (1) he reported to Tamburro that he believed he had been the victim of sexual misconduct by his accuser, and Tamburro never

6

investigated this claim or even responded to it (*Id.*, ¶ 27); (2) upon learning of the accuser's lawsuit, students circulated a petition, in which comments were made regarding Plaintiff's gender, and said petition was sent to Tamburro and several other DePaul administrators (*Id.*, ¶ 33); and (3) DePaul made a credibility determination in favor of Plaintiff's accuser, when it never spoke to her or her attorneys during the course of the investigation (and the accuser had never actually filed a complaint with the Title IX office in the first place) (*Id.*, ¶¶ 28, 40).

Similarly, Plaintiff can show a likelihood of success on the merits of his false light invasion of privacy claim. For a false light invasion of privacy claim, a plaintiff must show that a defendant placed him in a false light to the public, that said false light would be highly offensive to a reasonable person, and that the defendant acted with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Duncan v. Peterson*, 408 Ill. App. 3d 911, 920 (Ill. App. Ct. 2010).

Plaintiff's false light invasion of privacy claim is likely to succeed because he can show that DePaul administrators exercised control over when the article would be published and what it would say. The false statements in the article include, but are not limited to: (1) that Plaintiff had been the subject of "many complaints" of harassment at DePaul, a statement DePaul had reason to know was false; (2) quoted a student that was presented in the article as a student that had been in the same class as Plaintiff and his accuser (when she was not), allowing her to opine on the accusations and Plaintiff's professionalism; and (3) the article omitted the fact that Plaintiff had filed a defamation claim against his accuser. Plaintiff can also show that the false statements were highly offensive, as they imputed upon him the commission of a crime and a lack of professional integrity. Plaintiff can show that DePaul exercised control over the article's publication, because: the journalists were given access to records that would not otherwise be available to them; DePaul

7

administrators, including Defendant Tamburro, were quoted in the article; and the article's publication was conveniently timed after DePaul was dismissed from the accuser's lawsuit and on the same day that an NCAA investigation into the university went public.

**4) The balance of equities between the parties supports an injunction**

DePaul would not be harmed if the injunction were to issue. On the contrary, removing the article would allow Plaintiff to mitigate his damages by finding employment, thus allowing him to begin moving forward with his life. In any case, any harm that DePaul could point to does not outweigh the harm Plaintiff continues to incur while the article remains public.

**5) An injunction would not harm the public interest**

An injunction would not harm the public interest, as it is not in the public interest to propagate false information that is harmful to a person's reputation and professional opportunities.

## CONCLUSION

For the aforementioned reasons, Plaintiff respectfully requests the Honorable Court to grant a preliminary injunction ordering DePaul University to remove the article in question from the DePaulia website and Twitter Account.

Respectfully submitted,

     /s/ Christina Abraham

Christina Abraham, Esq.
Attorney for Plaintiff

Abraham Law & Consulting
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150
christina.w.abraham@hotmail.com

8

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that she caused a copy of Plaintiff's Motion for Preliminary Injunction to be served upon the following parties listed below via the Federal District Court for the Northern District of Illinois' Electronic Case Management System on **August 29, 2019**.

   /s/ Christina Abraham

Christina Abraham, Esq.
Attorney for Plaintiff


Abraham Law & Consulting
161 N. Clark Street, Suite 1600
Chicago, IL 60601
(312) 588-7150
christina.w.abraham@hotmail.com