IN THE FEDERAL DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LAITH SAUD, | |
| Plaintiff, | |
| | Case No.: 19-cv-3945 |
| v. | |
| DEPAUL UNIVERSITY, | Hon. Judge Joan B. Gottschall. |
| Defendant. | Hon. Magistrate Judge Susan E. Cox |

**PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Now comes Plaintiff LAITH SAUD and submits this Memorandum in Support of his Motion for Summary Judgment against Defendant DEPAUL UNIVERSITY, stating as follows:

### I.  SUMMARY OF FACTS

In the spring of 2017, Plaintiff Laith Saud's courses were canceled. PSOF ¶ 11. In the fall of 2017, Saud was permanently banned not only from teaching at DePaul University but also from participating in events co-sponsored by DePaul. PSOF ¶ 54. To date, Saud has been given various different explanations as to why his contract was canceled and for his banishment.

For twelve years, Saud was an instructor in good standing at DePaul. PSOF ¶¶ 4-5. Saud worked on areas related to the Middle East and comparative religion and politics. PSOF ¶ 5. He was recommended for speaking engagements and he received positive evaluations. *Id.*

In January of 2017, Saud hosted a panel discussion entitled "Muslim Civil Liberties in the Age of Trump." PSOF ¶ 6. Saud was flagged to senior administrators, including the President and the Office of Institutional Equity and Diversity (OIDE), the same office that conducts Title

1

IX investigations, for being a "vocal" critic of Donald Trump. PSOF ¶ 7. Administrators could not explain why Saud was flagged, when other white faculty members hosting panels were not. PSOF ¶ 8.

In the spring of 2017, Saud agreed to teach two courses in the fall of 2017 in Religious Studies. PSOF ¶ 11. Base pay for each course was $4800. PSOF ¶ 12. On April 6, 2017, an article about Saud's Arab-American background and teaching at DePaul was re-published by *Campus Watch*, a website sponsored by the Middle East Forum (MEF). PSOF ¶ 9. Campus Watch targets Arab faculty (or others sympathetic to the Palestinian cause) to "make life miserable" for them. PSOF ¶ 73. Within days, two false reports were made against Saud to OIDE, following a pattern of weaponizing OIDE against faculty, including in the Religious Studies department. PSOF ¶¶ 14-15, 69-77. Saud informed his supervisor, Khaled Keshk that he was under investigation, Keshk responded "they're going to discriminate against you." PSOF ¶ 17.

Saud cooperated with the Title IX investigation and was first cleared of wrongdoing. PSOF ¶¶ 20-22. Afterward, without Saud's knowledge, Keshk canceled Saud's contract. SOF ¶¶ 26-28. Thereafter, in June 2017, Tamburro used Keshk to contrive a new finding claiming Keshk had information corroborating a white woman accusing Saud of misconduct. OIDE reopened its investigation and by October 2017 it determined Saud violated DePaul policy. PSOF ¶¶ 38-41. OIDE claimed Keshk had knowledge that corroborated the accusers claims, but he did not. PSOF ¶ 44. The OIDE investigation based its findings primarily on Keshk and Tamburro's speculations and unsworn, uncorroborated pleadings made by the accuser. PSOF ¶ 41. In April 2019, a trial court determined the white accuser's claims false and awarded Saud on his defamation claim. PSOF ¶¶ 38-49.

Keshk, while testifying under oath, has provided inconsistent and varying reasons for canceling Saud's contract with DePaul: (a) because Saud requested too much enhanced pay (Comparator A asked for more enhanced pay and his contract was not canceled) (PSOF ¶ 35); (b) Saud lied during the Title IX investigation (DePaul has no evidence to corroborate that he lied) (PSOF ¶ 49); (c) Saud violated DePaul's sexual harassment policy (he was never informed what he did to violate the policy) (PSOF ¶50); (d) other women complained to Keshk about Saud (no other women complained and DePaul's OIDE records do not corroborate this claim) (PSOF ¶ 43). These various reasons were blatant pretext to cover up the fact that DePaul discriminated against Saud. DePaul applied rules to Saud in a manner not applied to others, and terminated and banned him from future employment as a result. Saud was exonerated at trial of CM's accusations and won a defamation counterclaim against her.

## II. LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" FED R. CIV. P. 56(c). When ruling on summary judgment, the court credits all admissible evidence presented by the nonmoving party and draws all justifiable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). The function of summary judgment is to determine whether there is a genuine issue for trial and "to isolate and dispose of factually unsupported claims." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); *Hemswoth*, 476 F.3d at 490.

In the context of an employment discrimination claim, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse

employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence must be evaluated as a whole. *Id.*, at 766.

One method of proving discrimination is the indirect burden shifting method under *McDonnell Douglas Corp v. Green*, 441 U.S. 792 (1973). Under this method, to establish a discrimination claim, a plaintiff must show he: (1) is in a protected class; (2) met the employer's legitimate expectations; (3) suffered adverse employment action; and (4) other similarly situated employees were treated more favorably. *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791-92 (7th Cir. 2020). The burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action. *Id.* at 792. "A pretext is a lie." *Id*. Where a plaintiff shows they were disciplined more severely than other similarly situated employees, the second and fourth prongs of the indirect method merge. *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011).

### III.     ARGUMENT

Summary judgment in favor of Saud is appropriate because there are no genuine issues of material fact that: (1) Saud was a member of a protected class; (2) he was meeting DePaul's legitimate expectations; (3) he suffered adverse employment action; and (4) other similarly situated employees were treated more favorably. Moreover, there are no genuine issues of material fact that each reason DePaul supplied for the adverse employment action it took is demonstrable pretext. Viewing the evidence as a whole, Saud has established a *prima facie* case of discrimination and the Court should grant summary judgment in his favor.

    a.  **Saud is a member of a protected class**

4

Arab is a racial category protected under § 1981. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987). Saud is Arab. PSOF ¶ 4. There is no genuine dispute as to this. Accordingly, Saud meets the first element of his § 1981 race discrimination claim.

### b. Saud was meeting DePaul's legitimate expectations

Saud was meeting DePaul's legitimate expectations. He received "Good" or higher performance evaluations. SOF ¶ 5. He was recommended by his peers for speaking engagements, including by the Chair of the Religious Studies Department, Khaled Keshk. PSOF ¶ 5. His courses were consistently filled to capacity and students were on waitlists to enroll in his courses. *Id*. He was recommended for renewal of his contract in 2017. *Id*. Prior to April of 2017, he had never been the subject of a misconduct complaint. *Id.*

DePaul may argue Saud was not meeting its legitimate expectations because he was accused of sexual misconduct. This argument is meritless. First, Saud won at trial against his accuser, thereby dismissing as false and defamatory any claim that he engaged in misconduct. SOF ¶ 68. Moreover, as elaborated *supra*, DePaul did not treat his comparators similarly. Should the Court consider this argument valid, then review of this element should be merged with the fourth element of the indirect method to determine whether Saud was treated differently from his comparators. *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011) ("When a black employee produces evidence that he was disciplined more severely than white employees who shared similar shortcomings, the second and fourth elements of the indirect method merge.")

Accordingly, there is no genuine issue of material fact that Saud meets the second element of the indirect method of proof: he was meeting his employer's legitimate expectations. Alternatively, this element should be merged and reviewed with the fourth element of the indirect method of proof, argued *supra*.

5

### c. Saud suffered adverse employment action

An adverse employment action is a "materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).

There is no genuine issue of material fact that Saud was subjected to adverse employment action for several reasons. Contract non-renewal is an adverse employment action. *Darchak v. Chi. Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009). The failure to rehire or reappoint constitutes an adverse employment action. See, *e.g.*, *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 644 (7th Cir. 2006); *Green v. E. Aurora Sch. Dist. No. 131*, 2009 WL 310913, at *4 (N.D. Ill. Feb. 5, 2009). Here, DePaul chose not to renew Saud's contract to teach as an adjunct in Autumn 2017. PSOF ¶ 35. DePaul's decision was an adverse employment action.

Second, Tamburro's investigation, which was conducted in a discriminatory manner, led to Saud's discipline. PSOF ¶¶ 49-54. That discipline included a determination that Saud was ineligible for rehire at DePaul and banning him from participating in DePaul events. PSOF ¶ 54. Saud was also denied an appeal. PSOF ¶¶ 55-56. *Rizzo v. Sheahan*, 266 F.3d 705, 717 (7th Cir. 2001) ("Adverse employment actions other than termination can constitute retaliation."). As such, the consequences of the investigation were adverse employment actions.

There is no genuine issue of material fact that Saud meets the third element of his claim in that he suffered adverse employment actions by DePaul.

### d. Other similarly situated employees were treated more favorably

The Seventh Circuit has emphasized "the similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th

6

Cir. 2012). While similarly situated employees must be "directly comparable to the plaintiff in all material respects," they "need not be identical in every conceivable way[,]" and the Court looks "for comparators, not clones." *Id.* at 846. Saud's Comparators were subject to similar accusations of misconduct, a similar process, similar circumstances and similar decision-makers. Saud can show that he was treated substantially differently from his comparators.

Comparator A is a white male who taught in the same department as Saud in the same position. Like Saud, Comparator A was accused of sexual misconduct. PSOF ¶ 57. Like Saud, OIDE did not communicate with the accuser, and only had a general accusation that Comparator A "raped" a student. *Id*. Unlike Saud, OIDE did not formally investigate the accusation. *Id*. Unlike Saud, Comparator A was not disciplined. *Id.* Unlike Saud, OIDE accepted Comparator A's "sleuthing." *Id.* Unlike Saud, OIDE did not produce a memo or report of investigation, nor did it issue any formal determination in the matter. *Id.*

Comparator A's treatment is consistent with testimony by witnesses that establishes DePaul's OIDE does not formally investigate every report it receives. PSOF ¶ 13, 25. This is particularly so where the accuser or "complainant" does not participate in the investigation. *Id.* Around the same time in April 2017, OIDE opened two investigations into Saud. PSOF ¶¶ 14-23. One was with respect to Student A (AR) and another regarding Student B (CM). PSOF ¶¶ 14, 18-19. The accusation regarding Student A was provided by a third party. *Id*. Although OIDE had spoken to Student A and had already determined from her that no misconduct occurred, it nonetheless formally investigated the report submitted by the third party. PSOF ¶¶ 18-19. Although OIDE had no cooperation from Student B and were threatened with litigation if they attempted to contact her, OIDE nonetheless formally investigated her report. PSOF ¶ 16.

7

Also like Saud, Comparator A had the same supervisor, and Keshk reported to the Dean of LAS, DeVelasco. SOF ¶ 58. Like Saud, Comparator A was informed in April of 2017 that his term faculty contract would not be renewed due to budget constraints. PSOF ¶¶ 11, 57. Like Saud, Comparator A was told he could teach as an adjunct. SOF ¶¶ 26-27, 31, 57. Like Saud, Comparator A was told he could request enhanced pay. *Id.* Like Saud, Comparator A requested enhanced pay; and even requested more money than Saud. PSOF ¶ 32. Like Saud, Comparator A's enhanced pay request was denied. PSOF ¶ 36. Unlike Saud whose contract was not renewed, Comparator A returned to DePaul under a standard adjunct contract. PSOF ¶¶ 26-27, 31-32, 57. Furthermore, while Saud was told that his salary requests were too high and this was why he was not being given an adjunct contract, DePaul did not tell Comparator A that he could not return because of his salary request. *Compare* PSOF ¶ 35, PSOF ¶ 57.

Comparator B is similar to Saud. Comparator B is a white male. PSOF ¶ 58. He taught in LAS. Like Saud, Comparator B was accused of violating the ADAH policy with respect to a student. *Id.* Like Saud, OIDE's Tamburro formally investigated the report. *Id.* Unlike Saud, the complainant in Comparator B's case made the report and cooperated with the investigation. *Id.* Unlike Saud, Tamburro proactively told Comparator B that he could file a cross-complaint against his accuser. *Id.* When Saud had emailed Tamburro stating he felt he was the victim of misconduct by his accuser, Tamburro did not tell him he could file a complaint against his accuser. PSOF ¶ 24. Tamburro did not investigate Saud's report of misconduct. *Id.* Unlike Saud, only Comparator B's department Chair determined the discipline. PSOF ¶ 58. In Saud's case, Velasco discussed Saud's discipline with DePaul's provost, denBoer, before Tamburro issued her findings in October of 2017. SOF ¶ 51. Unlike Saud, Comparator B was not banned

from participating in DePaul activities. SOF ¶ 55, 58. Unlike Saud, Comparator B's determination letter informed him of the reason for the adverse finding. PSOF ¶ 49.

Accordingly, there are no genuine issues of material fact that Saud was treated less favorably than similarly situated white faculty at DePaul.

### e. DePaul's stated reasons for the adverse actions are demonstrable pretext

"One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003).

DePaul has provided various different reasons for the cancellation of his contract and ban from the university: 1) Saud was not given an adjunct contract because he requested too much money in "enhanced pay." 2) Saud (along with DePaul) was the target of a lawsuit, so he was not invited to return to adjunct. 3) Saud was not invited to return to adjunct because he was subject to complaints by other former female students apart from the lawsuit. 4) Saud lied to OIDE and so he was not brought back to adjunct and later in October 2017 was permanently banned. 5) Saud was permanently banned because he was found to have violated DePaul's ADAH policy. As elaborated below, there is no genuine issue of material fact that each reason thus far proffered by DePaul has been a lie.

*Pretext 1: Saud asked for too much money*

When Saud was informed that he would not be brought back as an adjunct, he was told it was because of his enhanced pay request. PSOF ¶ 35. As established *infra*, Comparator A requested more money than Saud and was brought back to adjunct. PSOF ¶ 32, 57. Moreover, the evidence establishes DePaul took steps to cancel Saud's courses in May of 2017, before he made his enhanced pay request, showing further that the "low projected enrollment" was

9

Keshk's own doing. PSOF ¶¶ 26-30. DePaul did not inform Saud of this, rather, Keshk represented to Saud that his courses would be listed. PSOF ¶ 30. Moreover, during his deposition, Keshk admitted this reason was pretext. PSOF ¶ 35. Accordingly, there is no genuine issue of material fact that when DePaul told Saud he would not return to adjunct because he had requested too much money, this was a lie.

*Pretext 2: Saud (along with DePaul) was the target of a lawsuit,<br>so he was not invited to return to adjunct*

DePaul has claimed that CM's lawsuit was the reason it did not bring Saud back to adjunct. This is demonstrable pretext because CM's lawsuit was filed on June 29, 2017. SOF ¶ 37. The evidence establishes Saud's courses were canceled in May of 2017, prior to the filing of the lawsuit. PSOF ¶¶ 26-30. When Keshk was asked about this, he could not provide a reason. PSOF ¶ 30 . Comparator A's courses were not canceled. PSOF ¶ 30. Accordingly, DePaul cannot dispute the CM lawsuit was not the reason Saud's adjunct contract was withdrawn, because it had clearly determined it would not bring him back prior to its filing.

*Pretext 3: Saud engaged in other misconduct*

During his second deposition, and for the first time ever, Keshk claimed he decided not to bring Saud back to adjunct because, after having received new information from additional women, he was "fearful that those allegations were actually correct." PSOF ¶ 35. Playing the role of prosecutor and judge, Keshk did not ask Saud about the information he "gathered" because "it was clear to [him] that Laith would be lying to [him] whatever he said." *Id*. In fact, even though Keshk provided the "information" he allegedly received from others to Tamburro, and Tamburro investigated it, none of it led to an additional finding against Saud. PSOF ¶¶ 41-43. Keshk could not explain what "information" he had learned from other women, while

denying "gather[ing] any information" about Saud. PSOF ¶ 44. Accordingly, this reason is pretext.

*Pretext 4: Saud lied to OIDE*

Tamburro and Keshk claimed they determined Saud had lied during the first OIDE investigation. PSOF ¶ 49. Keshk stated this was the reason he did not want Saud back to adjunct. PSOF ¶ 35. Tamburro used this to determine Saud was not credible when he denied the relationship began during the course. This is pretext.

First, Saud informed Tamburro during the initial investigation that he socialized with CM during the course and that the sexual relationship occurred after the course was complete. SOF ¶ 21. He was subsequently cleared of any violation. PSOF ¶ 22. Keshk testified at the CM trial that he learned Saud had allegedly lied about when the sexual relationship began when OIDE made its determination in October 2017. PSOF ¶ 44. Keshk doubled down on this testimony during his deposition. *Id*.

Tamburro testified at the CM trial that she made the determination Saud lied about when the sexual relationship began based on information Keshk provided. PSOF ¶¶ 49. This is clearly implausible. The only information Keshk provided were alleged statements made by Saud that while CM was a student she "pursued him all through class, during and after…" PSOF ¶ 44. Tamburro concluded this implied the sexual relationship began earlier than Saud claimed. PSOF ¶ 49. Keshk now claims, in the third version of his explanation, Saud admitted the sexual relationship began during the class, and that Saud had told OIDE the sexual relationship began during the class. PSOF ¶ 39. Tamburro's report does not substantiate or explain explain what statement Saud made that explicitly confessed to having the sexual relationship during the class. PSOF ¶¶ 39, 47.

Tamburro further based her determination that Saud lied about when the sexual relationship began because in his response pleading to the CM complaint, he did not specify when it began. PSOF ¶ 49. This is pretext. Tamburro acknowledged Saud did not prepare the response, the attorneys DePaul selected for him did. *Id*. She also acknowledged she never asked Saud to clarify why his response pleading did not include this information. PSOF ¶¶ 46-47. When Saud provided her with his pleading, he asked her to contact him if she had any questions. PSOF ¶ 46. Tamburro did not do so. PSOF ¶ 47. Instead, she made her conclusions based on the conjecture that Saud's responsive pleadings would have affirmatively provided the date the sexual relationship began if it began after the class was over. PSOF ¶ 49.

The trial court in the CM trial, after examining the evidence and hearing the testimony of the witnesses, determined CM's account of when the sexual relationship began was not possible. PSOF¶ 68. Accordingly, there is no genuine issue of material fact that DePaul's contention Saud lied to OIDE about when the relationship began was pretext.

*Pretext 5: Saud violated DePaul's ADAH policy*

As the evidence establishes, Saud was punished for something that was not prohibited at DePaul, and the decision not to allow him to return as an adjunct was made prior to Tamburro's determination. An employer can set whatever performance standards it wants, provided they are not a mask for discrimination on forbidden grounds such as race..." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989).

Saud was punished in October of 2017 because Tamburro determined he engaged in a "sexual relationship" with a student while she was taking his course. PSOF ¶¶ 49-50. However, as established from the testimony of Tamburro and Ortiz, DePaul does not expressly prohibit consensual relationships between faculty and students, even when the student is enrolled in the

faculty member's class. PSOF ¶¶ 2-3. Tamburro's findings as to Saud specifically stated, "No information suggests that a sexual relationship was connected to the grade Student B received in the class." PSOF ¶ 49. Tamburro's finding that Saud engaged in the relationship while CM was attending his course was not simply incorrect, her use of it as the sole basis to determine the ADAH policy had been violated applied a rule onto Saud that was not applied to other faculty.

Tamburro's October findings occurred after DePaul had already determined it would not bring Saud back to adjunct in the Autumn of 2017. PSOF ¶¶ 26-31, 50. That decision occurred in May 2017, when DePaul canceled Saud's Autumn courses. PSOF ¶¶ 26-31. This was during the same time Tamburro issued her first determination in her OIDE investigation, which cleared Saud. PSOF ¶ 23. Accordingly, this reason for Saud's discipline in October of 2017 is demonstrable pretext.

### f. When viewing the evidence as a whole, there are no genuine issues of material fact that DePaul discriminated against Saud on the basis of his race

The disparate treatment experienced by Saud did not occur in a vacuum but is rather part of a larger pattern at DePaul wherein faculty of color are discriminated against and OIDE is weaponized to target them.

OIDE's Schaffer acknowledged faculty of color have complained the OIDE process was weaponized against them. PSOF ¶ 75. In 2016, when faculty of color criticized the university administration's handling of student protests after a racist, pro-Trump commentator was allowed to speak on campus, their criticisms were forwarded to OIDE. PSOF ¶¶ 69-72. At least two of those faculty were the subject of OIDE investigations and later sued DePaul for discrimination. PSOF ¶ 70. On one occasion, an African American faculty member brought a noose to the OIDE office in protest. PSOF ¶ 75. An African American member of DePaul's own OIDE office complained of discrimination by Tamburro, after Tamburro credited Schaffer's statements

13

over hers. PSOF ¶ 25. That former employee also stated Tamburro treated white faculty more favorably during investigations. *Id*. DePaul also denied tenure to a Jewish American academic with pro-Palestinian views, and after the professor challenged his denial of tenure, he became the subject of two OIDE complaints. PSOF ¶ 74.

In January of 2017, before any accusations against him, Saud facilitated a panel entitled "Muslim Civil Liberties in the Age of Trump." PSOF ¶ 6. Blakley, DePaul's VP of Marketing and Communications, flagged the event to the President's "cabinet," including OIDE. PSOF ¶¶ 7-8. The cabinet consists of high-level administrators who "make decisions about the operation of the university." *Id*. Blakley and her subordinate noted that Saud had been "vocal about his dislike for Trump." PSOF ¶ 7. Blakley acknowledged she does not inform the cabinet of all events on campus. PSOF ¶ 8. Members of the cabinet who were deposed (Blakley, Ortiz, Holtschneider and denBoer) could not recall what, if anything, was discussed or done regarding the event Blakley flagged. PSOF ¶ 8.

Shortly thereafter, on April 6, 2017, a website that targets Arab academics and sympathizers published an article about Saud discussing Saud's Arab-American upbringing and his teaching at DePaul. PSOF ¶ 9. DePaul contracts with a third party to search for and report all internet references to DePaul. PSOF ¶ 10. Within days, DePaul received the lien letter sent by CM's attorneys, and three days after that OIDE opened its investigation of Saud over two false allegations. PSOF ¶ 14.

Saud's direct supervisor, Keshk, facilitated DePaul's discrimination because he wanted to keep his job safe. Keshk believed Saud would "throw [him] under the bus." PSOF ¶ 41. Keshk was up for reappointment at the same time DePaul was taking steps to remove Saud. PSOF ¶ 34. When Saud first told him he was being investigated by OIDE, Keshk warned him DePaul would

discriminate against him. PSOF ¶ 17. Keshk consulted with DePaul's general counsel and other high level administrators the same day he informed Saud he would not return to adjunct. PSOF ¶ 35. Keshk testified the Dean's office was involved in determining whether to bring Saud back to adjunct because they are "always involved" in those decisions. *Id.*

Keshk was involved in DePaul's summer investigation of Saud, but did not know whether he was helping with the litigation or the OIDE investigation. PSOF ¶ 41. Keshk provided Tamburro with the contact information of Arab and Muslim women. PSOF ¶¶ 42-43. Keshk was told to "if there's any communication or any indication about the lawsuit, I should turn over all material to [Tamburro]". PSOF ¶ 41. Keshk did not understand the distinction between the lawsuit and the OIDE investigation. *Id*.

Keshk may dispute this, but his testimony is self-serving. Moreover, sworn statements from two of his subordinates indicates Keshk routinely ignores discrimination issues raised by faculty. PSOF ¶¶ 72-73. For example, Keshk ignored the concerns of faculty in his department who received threatening messages that included racial epithets after the university allowed a controversial pro-Trump speaker, Milo Yiannopoulos, to speak on campus. PSOF ¶ 72.

Given the evidence in the record and the absence of any non-pretextual reason for the disparate treatment by DePaul, there is no genuine issue of material fact Saud establishes a *prima facie* case of discrimination and summary judgment in his favor should be granted.

## CONCLUSION

WHEREFORE, Plaintiff LAITH SAUD respectfully requests the Honorable Court grant his motion for summary judgment against DePaul University.

Dated: April 18, 2023

                    Respectfully Submitted,

                    /s/Christina Abraham

                    Christina Abraham
                    Attorney for the Plaintiff

Attorney No. 6298946
Christina Abraham, Esq.
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
312-588-7150

## Certificate of Service

The undersigned attorney hereby certifies that she caused a copy of Plaintiff's Memorandum in Support for his Motion for Summary Judgment to be served upon the following parties listed below, via the Northern District of Illinois Electronic Case Management System to all parties registered for electronic service on April 18, 2023.

                    /s/Christina Abraham

                    Christina Abraham
                    Attorney for the Plaintiff

Attorney No. 6298946
Christina Abraham, Esq.
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
312-588-7150