## INTRODUCTION

DePaul has provided shifting explanations for the termination of Plaintiff Laith Saud ("Saud"), an Arab-American former faculty member. Each explanation is demonstrably pretext and even if taken at face value, white faculty members similarly situated were treated more favorably. The major players involved have a history of discriminating against faculty of color and favoring white colleagues (including Khaled Keshk, Saud's Arab supervisor). DePaul's argument rests on facts that are in dispute: 1) The claim "two additional students reported concerns" is false; 2) The claim the additional "reports" were a primary "issue" in Keshk not rehiring him is false - Keshk cancelled Saud's classes in May of 2017, six weeks before he asserts there were "additional complaints". DePaul only began making this claim in February 2022, since its other claims fell apart under scrutiny and show favoritism of white faculty.[1] 3) DePaul insinuates it has a policy prohibiting relationships between faculty and students, it does not and Saud never violated the policy it does have. 4) Saud was treated differently from white faculty who requested "enhanced pay", or were accused of misconduct, or both. 5) DePaul used false claims as pretext to terminate his classes and issue a lifetime ban. For these reasons, DePaul's motion should be denied.

## SUMMARY OF FACTS

I. Saud was subject of an article in *Campus Watch*, a Middle East Forum affiliate and publication that targets Arab-American faculty for their perceived political views.

On April 6, 2017, Saud was targeted by a website that attacks Arab American faculty. PSAOF ¶ 8.[2] The following week *two* false reports were made to OIDE; Saud had never been accused of misconduct before. PSOF ¶¶ 9-10, 13-19.[3] Keshk was aware the damage the website caused for

---

[1] Even when the Defendant deposed Saud in January of 2022 they did not bring up these claims.

[2] DePaul's Statement of Facts is abbreviated DSOF ¶ __, Saud's response is abbreviated PRDSOF ¶__, his Statement of Additional Facts is abbreviated to PSAOF ¶ ___, and Saud's Statement of Material Facts in support of his Motion for Summary Judgment is abbreviated to PSOF ¶ __.

[3] Another faculty member submitted an affidavit regarding a pattern of OIDE complaints following such targeting. PSOF ¶ 73.

Arab faculty, Saud testified his relationship with Keshk began to sour. PSAOF ¶ 8. Keshk committed perjury numerous times during his deposition. PRDSOF ¶ 56.

II. <u>In the spring of 2017, Saud was told he had an adjunct contract for the Fall of 2017, but Keshk secretly cancelled his courses and mislead Saud about the reasons.</u>

In Spring 2017, Saud was in good standing and ready to continue teaching. On April 11, 2017, Keshk offered to reduce Saud's Fall courses from three to two, following budget cuts, so he could adjunct. PRDSOF ¶ 37. ███████ ("Comparator A"), a white colleague, was made the same offer. *Id*. In May 2017 Keshk secretly cancelled all of Saud's courses for the Fall. PSOF ¶¶ 26-31. Students attempting to sign up for his courses informed him they were off the books. PSOF ¶ 27. When Saud asked Keshk, Keshk misled him and claimed he was rescheduling both Saud and Comparator A's courses. *Id*. This was untrue; Comprator A's adjunct courses were on the books. *Id*. Saud was terminated in DePaul's database as of June 26, 2017. PSOF ¶ 31.

III. <u>DePaul's ADAH policy does not prohibit faculty student relationships; Saud disclosed his relationship with C.M. and was cleared in the initial investigation.</u>

In April of 2017, OIDE opened an investigation into two reports, a day apart, brought against Saud following the publication. PSOF ¶¶ 9, 14-19. Saud was never the subject of an OIDE report before. PSAOF ¶ 11. He was cleared on both reports. DSOF ¶¶ 31-32. Student A told OIDE nothing inappropriate happened between them and provided an affidavit in this case. PRDSOF ¶ 24. Student B (C.M.) refused to cooperate. DSOF ¶ 29. In May 2017, Saud told Tamburro, the investigator, he had a relationship with C.M, he socialized with her during the class and sex occurred after the class was over. PSAOF ¶ 16. Because it was a year after the fact, Saud was not sure exactly when it occurred, he provided a range of late May/early June 2016. *Id*. Saud informed Tamburro his class ended early that quarter because there was no final (finals week begins in mid-May). *Id*. Tamburro asked Saud his understanding of the ADAH policy and Saud provided it.

PSAOF ¶¶ 17-18. Saud was not told that a relationship by itself violated the policy. PSAOF ¶ 18.

Tamburro was aware C.M. returned that Fall but did not find Saud in violation of the policy. *Id.*

IV.    Saud was offered and accepted his adjunct contract.

Saud was offered an adjunct contract on April 11, 2017 for $4800 per course and accepted it.

PSOF ¶ 11. He accepted the contract well before May 10, 2017 (Pl. MSJ Ex. 1, p. 190:13-15), as

DePaul now claims he only began to pursue his position after May 10.

V.    On June 29, 2017 C.M. Filed a Lawsuit Against Saud and DePaul, C.M. was Found
      Liable for Defaming Saud.

On June 29, 2017, Saud was still a Visiting Assistant Professor. DSOF ¶ 13. Although Saud

was promised to teach adjunct courses in the Fall that year, Keshk cancelled his courses shortly

after the *CampusWatch* article. PSOF ¶¶ 9-11, 26-36. Saud never resigned and was not even aware

of this claim until February 2022.  PRDSOF ¶ 26.

C.M. alleged Saud "used his position" to coerce her into sex, "plied with her alcohol," while

"forcibly pursuing sex" and offered to "excuse her from the final but give her in A" in exchange.

DSOF ¶¶ 42-43. As established at trial, there was no final in the class. PSAOF ¶ 31. After bench

trial, the court ruled in Saud's favor. PSAOF ¶¶ 30-31. She concluded, given the timeline and

evidence, C.M.'s claims of assault could not have happened, the relationship with Saud was

consensual, and no *quid pro quo* occurred. *Id*. The judge also found C.M. lied about Saud and

granted his defamation claim. *Id.* C.M. did not appeal.

VI.    Keshk cancelled Saud's adjunct contract.

DePaul claims new reasons Saud was not retained: it "received two additional complaints"

from "students" or "former students" regarding his conduct. PRDSOF ¶ 48. DePaul never received

additional complaints about Saud. Between June 30 and July 5, Keshk reported information about

Saud from four women; none were current students, three were never students of Saud, and all

were Middle-Eastern and/or Muslim. *Id*. Regardless, Keshk cancelled Saud's classes for the Fall

six weeks before in May 2017. PRDSOF ¶ 37. The women did not voluntarily go to OIDE and none filed a complaint after Keshk had OIDE contact them. PRDSOF ¶ 48.

VII.    There are issues of material fact as to OIDE's second investigation into Saud.

There are several issues of material fact regarding the second OIDE investigation: 1) Tamburro never determined the conduct Saud engaged in that constituted a violation of the ADAH policy. PSAOF ¶ 24. 2) Tamburro almost exclusively used "information provided by Keshk," to make a credibility determination about Saud, not a determination about his conduct. PSAOF ¶ 26. Keshk had no information at all, so DePaul now pretends Tamburro made a credibility determination without him. PSAOF ¶ 27. 3) Saud cooperated with the investigation and was open to further cooperation. DSOF ¶ 27; PRDSOF ¶¶ 61-62. 4) Tamburro omitted key facts that if included, would have undermined DePaul's pretext for the discipline. Pl. MSJ Ex. 59, p. 5. Saud has never "admitted" he had sex with C.M. before the end of his course.  PRDSOF ¶ 27.

Tamburro's second determination letter finds Saud in violation of the policy. DSOF 65. But Tamburro never informs Saud what he did to violate the policy and still cannot provide an answer. PSAOF ¶ 24. Tamburro informs other investigated faculty what they have been accused of and what they did to violate ADAH. PRDSOF ¶ 80. Her report relied on information from Keshk to determine Saud lied about when the sex occurred. DSOF ¶ 65. At trial, when Keshk was asked how he learned of the information, he confessed only "from the Title IX report." PSOF 44. Keshk has been unable to provide a consistent or coherent answer to this question. *Id*.; PRDSOF ¶ 56.

DePaul misrepresents Saud's cooperation with the second investigation.  DePaul claims Saud "refused" to cooperate with the second investigation (DMISO p. 5), which is false. Saud ended his email with "should you feel you need additional information, please contact me." Tamburro responds: "Thank you…I will be in contact with you if any additional information is needed." PRDSOF ¶¶ 61-62. Tamburro did not contact Saud again. *Id*. DePaul mischaracterizes whether the

4

class was still occurring when Saud and C.M. had sex. Saud repeatedly maintained the class was over when it occurred. PRDSOF ¶ 66. Tamburro's investigation is evidence of pretext for the later discipline: she never investigated Saud's counter complaint (PSOF ¶ 24), which she did with others (PSOF ¶ 60) and never spoke with C.M. (PSOF ¶ 58). Cheryl Wayne, a former Title IX investigator at DePaul, testified you cannot complete an investigation without speaking to both sides, because it would adversely affect a credibility determination. PSAOF ¶ 38. She also observed Tamburro treating white faculty/staff more favorably. PSOF ¶ 76.

VIII.  The Dean Was Not Involved in Comparable Cases and the Dean Does Not Know Why He Banned Saud for Life.

Velasco is not always involved in imposing discipline in OIDE matters. PSOF ¶ 58. Velasco could not explain why he imposed the discipline on Saud. PSOF ¶ 53. He conferred with the Provost (denBoer), Tamburro, and the Office of General Counsel on his decision. PSOF ¶¶ 51-56. He did not allow Saud to appeal. PSAOF ¶ 29.

**REQUEST TO TAKE JUDICIAL NOTICE OF THE APRIL 2019 TRIAL ORDER**

Per Federal Rule of Evidence 201, this Court should take judicial notice of Saud's Motion for Summary Judgment Exhibit 35, the Order of the trial court in the C.M. matter.

**OBJECTIONS TO THE ADMISSIBILITY OF EVIDENCE PROFFERED BY DEPAUL**
*Objection to the Declarations of Velasco, Tamburro, Keshk and Schaffer*

Saud objects to the declarations of Velasco, Tamburro, Keshk and Schaffer. Def. MSJ Exs. 1, 6, 8, 30. The declarations address matters already addressed in depositions and do not explain how or why the statements supplement the testimony. The Court should not consider these declarations. "[P]arties may not 'patch-up potentially damaging deposition testimony' with a contradictory affidavit." *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999). "A contradictory supplemental affidavit is admissible if the party offers a suitable explanation such as 'confusion, mistake, or lapse in memory for the discrepancy." *Commercial Underwriters v. Aires Envtl*, 259 F.3d 792, 799 (7th Cir. 2001). DePaul's declarations gloss over facts to patch up damaging

testimony. For example, Velasco, Keshk and Tamburro's blanket statements they did not consider race in their decisions is an attempt to patch up testimony that shows Saud was treated differently. Additionally, Schaffer's declaration ¶¶ 4-5 should be stricken because during her deposition she could not recall anything about Comparator A's investigation.  Her declaration does not explain how she is now able to recall the matters stated. Finally, the second and third sentences of Schaffer's ¶ 6 are vague and lack foundation; they do not provide the basis of her knowledge. A declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show the affiant or declarant is competent to testify on the matters stated.  FRCP 56(c)(4).

***Objection to Defendant Exhibits as hearsay if offered to prove the matters asserted therein.***
A court may consider only admissible evidence on a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003); See also *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (inadmissible hearsay from an affidavit or deposition insufficient to overcome summary judgment). DePaul offers exhibits 12-14, 20, 24, 27-28, 34, which include notes typed from Tamburro's destroyed handwritten notes (PRDSOF ¶ 27), investigation memos and determination letters. They are inadmissible if offered to prove the truth of the matters asserted. Rule 801(c).  *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574-75 (7th Cir. 2021). Also, "reports prepared with an eye toward litigation" "are not admissible under Rule 803(6)." *Thakore v. Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp.2d 705, 725 (N.D.Ill. 2009).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT
On summary judgment, the court must construe the evidence and grant all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may not make credibility determinations on summary judgment.  *Id.*

On employment discrimination cases, the Seventh Circuit has clarified the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence must be evaluated as a whole. *Id.*, at 766.

## ARGUMENT

**I. Saud can succeed on his Section 1981 race discrimination claim for DePaul's failure to return him to teach as an adjunct in the 2017 Fall Academic Quarter**

### A. Saud establishes a *prima facie* case of race discrimination

DePaul argues Saud cannot establish a *prima facie* case of race discrimination because he cannot prove he was qualified, or that similarly situated individuals were treated more favorably. DePaul MISO p. 6-7. The arguments fail; Saud can show he was meeting or exceeding expectations, violated no rule, and similarly situated white faculty were treated more favorably.

### 1. Saud was qualified for an adjunct faculty appointment

Saud was meeting DePaul's legitimate expectations. He received good performance evaluations. PSAOF ¶ 5. He was recommended by peers for speaking engagements, including by Keshk. *Id*. His courses were consistently filled. *Id*. He was recommended for renewal of his contract in 2017. *Id*. Prior to April of 2017, he was never the subject of a misconduct complaint. PSAOF ¶ 14. When he was informed his term faculty contract would not be renewed in April of 2017, Velasco's letter noted his positive performance. PRDSOF ¶ 14.

DePaul argues Saud was not qualified because Keshk knew: (i) C.M. filed a lawsuit; (ii) Saud had sex with C.M.; and (iii) DePaul received "two additional complaints" about Saud. DePaul MISO p. 7. DePaul's arguments fail because it doubles down on its pretext. Keshk cancelled Saud's courses in May, before the lawsuit and before he claims he received additional "complaints". PRDSOF ¶ 37. Saud also proved C.M.'s allegations false. PSAOF ¶¶ 30-31.

Further, Keshk's claim Saud told him he had had sex with C.M. during his class is false, and DePaul should be cautious about relying on them. "[A] party cannot defeat summary judgment by having a witness contradict her own prior deposition testimony." *Patton v. MFS/Sun Life Financial Distributors, Inc.*, 480 F.3d 478, 488 (7th Cir. 2007). Keshk testified at C.M.'s trial he learned of the information from Tamburro's October 2017 report. PRDSOF ¶ 55. Embarrassingly for DePaul, Tamburro's report relies on information allegedly from Keshk, which claims Saud told him C.M. had been "pursuing him" "before and after" the class, and so surmised it occurred during the course (even though this conclusion is nonsensical). *Id.* Keshk first denied Saud told him when it occurred, and then in the same deposition claimed he explicitly told him it was during the class. PRDSOF ¶ 56. Keshk's inconsistent, self-serving testimony is insufficient for summary judgment.

Regarding the "two additional reports" DePaul now asserts as the basis for Saud not returning, DePaul's characterization of "reports" is unsubstantiated. Keshk was asked at the C.M. trial, *in April of 2019*, why Saud was not brought back to teach; he said it was because of budget cuts. Pl. Resp. PSAOF ¶ 32. Keshk was directly asked whether the lawsuit had anything to do with Saud's departure and Keshk denied it. *Id.* That he now claims it was the primary reason for his decision is insufficient as a matter of law to satisfy DePaul's burden for summary judgment.

The evidence establishes Keshk did not merely receive "two additional complaints," he was directed by DePaul to gather information against Saud, or took it upon himself to attempt to discredit Saud. This is another matter Keshk has been inconsistent about in his testimony. PRDSOF ¶ 48. This is evidence the OIDE investigation was predetermined, and a pretext. Moreover, there is no evidence these other women complained about Saud or that they provided information that would constitute an allegation of misconduct. *Id.* One report involved information from a "friend of a friend" of Keshk's source that another woman "liked" Saud. PRDSOF ¶ 49.

Another involved a situation where Saud offered his babysitter a drink on one occasion after he came home, and according to Tamburro's notes the babysitter (who was never a student of Saud's) did not say she felt uncomfortable by it; Tamburro's notes characterized the interaction as "unusual" not "uncomfortable". *Id.* The babysitter also explicitly stated Saud made no sexual or romantic advances towards her. Keshk also provided Tamburro a text message from an Arab student who merely acknowledged the *Sun-Times* article and did not discuss Saud. PRDSOF ¶ 46.

Keshk's self-serving claim he did not bring Saud back to teach because the lawsuit and "two additional" complaints were a "'black cloud' hanging over Saud" (Def. MISO p. 10) is pretext because DePaul cancelled his classes before the lawsuit was filed or "additional complaints" were made. Keshk created the "black cloud" he later pointed to as the basis.

Finally, if the "additional claims" were indeed used to terminate Saud, then he was entitled the opportunity to provide his side of the story. White faculty are always informed and integrated into investigations, Saud's disparate treatment in this respect merely raises more reasons for a jury to conclude DePaul discriminated against him. DePaul cannot have it both ways. Keshk cannot hide his discriminatory animus towards Saud; he feared for his position and shut his eyes every time a faculty member raised issues of race discrimination. When asked whether Saud should have been asked about the "additional complaints", Keshk seethed as he stated "no" because he was certain Saud would be "lying to [him] whatever he said." PRDSOF ¶ 48. Keshk openly denies Saud the same rights that white faculty members have. DePaul's motion should be denied.

**2. Similarly situated individuals were treated more favorably than Saud**

"[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Comparators "need not be identical in every conceivable way", the Court looks "for comparators, not clones." *Id.* at 846. Saud's

Comparators were subject to similar accusations of misconduct, circumstances and decision-makers. Saud can show that he was treated substantially differently from his comparators.

DePaul argues Comparator A, ▮▮▮▮▮ a white term faculty member in the same department, is not similarly situated because (i) he was not the subject of an ongoing lawsuit accusing him of sexually assaulting a student, (ii) did not have sex with a student in his class; and (iii) did not have two former students report to Keshk concerns of inappropriate conduct." Def. MISO p. 8. Like with Keshk, DePaul doubles down on its pretexts and its arguments fail.

Saud's courses for Fall 2017 were cancelled in May, Comparator A's were not. PRDSOF ¶ 37. This was before C.M.'s lawsuit. *Id*. For the reasons laid out *supra*, the claim two former students made "complaints" is not substantiated by the record. Comparator A was accused of raping a student. DSOF¶ 74. OIDE received the report, but since the accuser failed to cooperate with the investigation, the investigation was closed, confirming Wayne's assertion that an investigation cannot be one-sided. DSOF ¶¶ 75-78. Saud's accuser failed to cooperate with the Title IX investigation as well (twice); in his case though the investigation continued until an adverse finding could be made. Finally, DePaul contends Comparator A is "further distinguish[ed]" from Saud because his "potential class had low enrollment." Def. MISO p. 9. But Keshk cancelled Saud's courses, preventing students from signing up, which created this pretext. PRDSOF ¶ 37. Keshk testified Saud's classes were consistently full. PSAOF ¶ 5.

Because Comparator A had been accused of sexual misconduct, had his term faculty contract cancelled, was told he could request enhanced pay, requested more money to teach as an adjunct than Saud, did not have his Autumn 2017 classes cancelled in May of 2017, and was brought back to teach as an adjunct in Autumn 2017, there are enough common features to consider him a comparator. Moreover, there is sufficient evidence to establish he was treated more favorably.

**B. DePaul's reason for his non-hire was pretext for race discrimination**

A few facts elaborating pretext are: (1) Saud's January 2017 event on campus about Muslim civil rights was flagged to high-level administrators; (2) days before he is accused, Saud was the subject of a *Campus Watch* article; (3) DePaul never informed Saud of additional complaints when it reopened his investigation in August 2017; (4) Keshk was up for reappointment in June 2017; (5) Keshk has a pattern of ignoring faculty discrimination concerns, but was aware of them; (6) Keshk believed Saud would "throw [him] under the bus"; (7) Saud was not afforded an appeal.

DePaul points to cases in support of its argument that are clearly distinguishable. *Dorado v. Dial Corp.*, 2007 U.S. Dist. LEXIS 25562, at *4 (N.D. Ill. Apr. 5, 2007) (multiple individuals came forward, as well as information from discovery, not allegations from a lawsuit); *Naca v. Macalester Coll.*, 947 F.3d 500, 501-502 (8th Cir. 2020) (Doe went to Title IX herself and participated in an investigative process before Naca was let go. The school prohibited faculty-student relationships *per se*); *Edwards v. Ind. Univ.*, 2020 U.S. Dist. LEXIS 74813, at *38 (S.D. Ind. Apr. 29, 2020) (school prohibited relationships *per se*, accuser participated in investigation). In all cases, the information relied upon by the employer included first-hand statements from an accuser. In all cases, the plaintiffs were not terminated *before* the investigative process completed. DePaul's argument there are no genuine issues of material fact as to pretext is unavailing.

**II. Saud can succeed on his Section 1981 claim for the permanent ban DePaul imposed**

DePaul asserts Saud cannot establish but for his race, Velasco "would have allowed Saud to remain eligible for employment" Def. MISO p. 11. The argument fails: Velasco was not the sole decision maker involved, there are issues of material fact as to whether Velasco was aware of Saud's race, and whether the cat's paw theory would apply considering Tamburro led him to believe she found all of C.M.'s allegations true. PSOF ¶ 53, *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016); *Staub v. Proctor Hosp.,* 562 U.S. 411, 420 (2011).

### A. Saud establishes a *prima facie* case of race discrimination

**1. There are genuine issues of material fact as to whether Velasco was aware of Saud's race**

In July 2016 Velasco received an email regarding a TedX talk by Saud discussing his Arab background. He also recalled something about a talk Saud gave in January 2017; the talk regarded his Arab upbringing. PRDSOF ¶ 10. The record establishes Velasco was not the sole decision maker involved in determining discipline. He discussed discipline with Tamburro, denBoer, and general counsel and adopted Tamburro's findings without question. PSOF ¶ 51-56.

**2. Saud was qualified to remain eligible for future employment**

DePaul argues Saud was not qualified to teach because OIDE determined he violated its ADAH policy by "having sex with a student in his class". Def. MISO p. 11. The argument fails because it is false, and because there are *at minimum* genuine issues of material fact that the OIDE outcome was predetermined because of a discriminatory animus against Saud.

DePaul points to *Bolchini* and *Fluckes* for its argument, but *Bolchini* is distinguishable because again in those cases the investigator spoke directly with the complainant that alleged the misconduct. *Biolchini v. General Electric Company*, 167 F.3d 1151 (7th Cir. 1999); *Fluckes v. Johnny Rockets Group, Inc*., No. 07 C 3050 (N.D. Ill. Dec. 10, 2008). In this case, a credibility determination was made in favor of the accuser based largely on information from Keshk, the accuser never cooperated. PSAOF ¶ 26. This, with the transparent efforts of Tamburro and Keshk to elicit new information about potential others smacks of pretext. Moreover, DePaul's ADAH Policy does not prohibit relationships between faculty and students, even while a student is enrolled in a class. PRDSOF ¶ 3. DePaul's admission it applied the policy in this manner, while even Tamburro acknowledged this is not how the policy is applied, is evidence of pretext.

**3. Similarly situated individuals were treated more favorably than Saud**

A comparator need not be a "clone." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Saud's Comparators were subject to similar accusations, processes, and decision-makers. Saud can

show he was treated substantially different from his comparators. DePaul argues Comparator A is not similarly situated because (i) the Dean did not make decisions about his employment in 2014; (ii) a different investigator reviewed his complaint; (iii) the investigation was a case of "mistaken identity"; and (iv) the investigator determined he did not violate policy.  Def. MISO pp. 12-13. The argument fails because (i) Keshk made decisions about Comparator A's employment, as he did in Saud's case; (ii) OIDE cannot make an adverse finding against someone if the accuser fails to cooperate with the investigation, so the investigation was closed. The accuser named Comprator A by name, university and department; his explanation that it was a case of mistaken identity, as absurd as that sounds, had to be taken since the accuser never came forward to cooperate. Saud's accuser never cooperated, yet Saud was investigated on multiple occasions, sometimes informed, sometimes not, until an adverse finding could be made.

Saud can also point to Comparator B, ███████████ a white adjunct faculty member.  As his MSJ MISO argues, Comparator B was treated more favorably when Tamburro investigated him for violating the policy. PSOF ¶ 58.  Comparator B's accuser cooperated during her investigation, and Tamburro proactively told him he could file a cross-complaint. *Id*. She did not do that with Saud, even when he told her in 2017 he felt he was the victim of misconduct by C.M. PSOF ¶ 24. A one-sided investigation is pre-text. Comparator B's department chair imposed the limited discipline, whereas in Saud's case it was the Dean after consultation with Tamburro, denBoer and general counsel, imposing a ban on even participating in DePaul sponsored events at other universities, effectively destroying Saud's academic career.[4] Comparator's A and B are similarly situated and were treated more favorably.

### B. There is substantial evidence to support Saud's claim the OIDE determination was pretext for race discrimination and DePaul does not merit summary judgment

___

[4] Comparator B still works as an academic to this day. DePaul did not cause the *DePaulia* to publish an article about him. *See* PSOF ¶¶ 59-67.

DePaul argues Saud's claim fails because "it is undisputed Saud had sex with C.M. while she was enrolled in Saud's class." Def. MISO p. 13. DePaul misleads this court; Saud was not found in violation of the policy for having a relationship with a student, because that is not a violation, he was found in violation for having allegedly "lied" about when. Tamburro claims Saud lacks credibility so the preponderance of the evidence resulted in a violation against Saud. At the heart of this case is credibility: Keshk and Tamburro claim Saud told them one thing; Saud asserts he told a full story which they are omitting. Current faculty, former faculty and students have produced affidavits, records, and witnesses to support Saud's explanation the class ended early, that Title IX was out to get him and that Keshk repeatedly lies under oath. DePaul has never produced a single witness or affidavit against Saud beyond Keshk and Tamburro, including any "accusers." Saud also would not have to lie about "when" the relationship took place because they are not prohibited by policy and Tamburro confirmed Saud's understanding of the policy was correct. DePaul falsely claims Saud admitted to contradicting himself, which is the basis of the adverse finding. *Id.* The claim is unsubstantiated. *See* PRDSOF ¶ 35. DePaul also falsely claims "[T]here is no evidence DePaul allows any person, regardless of their race, to have sex with a student and continue being eligible for employment at DePaul." Def. MISO p. 14. The record establishes DePaul did not interpret it's policy to prohibit such relationships. PSOF ¶ 13.

As elaborated in Saud's MISO, there is substantial evidence that points to pretext. Pl. MISO pp. 9-13. The investigation began days after Saud was the target of an article on a website that targets Arab academics. PSOF ¶ 14. Tamburro made a credibility determination with information allegedly provided by Keshk. PASOF ¶¶ 26-27. At C.M's trial, Keshk testified he learned the information from Tamburro's report. PSOF ¶ 44. Tamburro claims she based her determination on Saud's Answer to C.M.'s complaint. DSOF ¶ 65. When Saud provided his Answer, he asked her

to contact him if she had questions. PRDSOF ¶ 61. Tamburro did not. PRDSOF ¶ 62. Saud's

Answer did not provide a date for when the sex occurred, but Tamburro concluded he would have

affirmatively provided it had he not been lying. DSOF ¶ 65. DePaul's conclusion was not correct;

the Circuit Court found C.M.'s account of events impossible. PSAOF ¶¶ 30-31.

### III. DePaul's argument regarding a "due process" claim is a red herring

DePaul's argument "Saud cannot pursue a due process claim" is a red herring.  Def. MISO p.

14.  For the reasons elaborated in this memo and Saud's MISO, he can dispute the accuracy of

Tamburro's October 2017 findings because he can establish the investigation was predetermined,

to be used as pretext for DePaul's adverse actions.  Of the six reasons listed by DePaul in support

of that argument, only two have not yet been explicitly addressed: "(v) it would be unbelievable

to infer OIDE's finding was based on Saud's race given Tamburro determined Saud… did not

violate DePaul's policies when she first investigated C.M.'s claim in May 2017" and "(vi) … Saud

cannot identify any instance in which OIDE determined a professor had sex with a student in the

professor's class and did not find a violation of the ADAH policy."  Def. MISO p. 15.

DePaul's point (v) fails because the fact that Tamburro cleared Saud in May 2017 does not

dispositively overcome all the other evidence that supports an inference of race discrimination,

such as, for example, the testimony of a former OIDE employee that stated Tamburro showed

preference to white employees and faculty.  PSOF ¶ 76. Tamburro could have made her May 2017

determination for various reasons, such as that in May she had no detailed claim from the accuser

to go on whatsoever and needed more cover for her pretext, which C.M.'s lawsuit later provided.

Keshk had a pattern of ignoring discrimination concerns and was up for reappointment that quarter.

PSAOF ¶ 33. DePaul's point (vi) is equally unavailing. As noted *supra*, DePaul's policy does not

prohibit relationships between faculty and students, even when the student is enrolled the faculty's

class. PRDSOF ¶ 3. Being punished for something that is not a rule violation is evidence of pretext.

## CONCLUSION

WHEREFORE, Plaintiff LAITH SAUD respectfully requests the Honorable Court deny

Defendant DEPAUL UNIVERSITY'S Motion for Summary Judgment. Plaintiff renews his

request for oral argument on the matter because the case is factually detailed and may require the

parties to answer questions to the Court to more efficiently examine the facts in evidence.


Dated: August 16, 2023


                                                        Respectfully Submitted,


                                                        /s/Christina Abraham

                                                        Christina Abraham
                                                        Attorney for the Plaintiff

Attorney No. 6298946
Christina Abraham, Esq.
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
312-588-7150

## **Certificate of Service**

The undersigned attorney hereby certifies that she caused a copy of Plaintiff's

Response to Defendant's Motion for Summary Judgment to be served upon the following parties

listed below, via the Northern District of Illinois Electronic Case Management System to all

parties registered for electronic service on August 16, 2023.


/s/Christina Abraham

Christina Abraham
Attorney for the Plaintiff

Attorney No. 6298946
Christina Abraham, Esq.
Abraham Law & Consulting, LLC
161 N. Clark Street, Suite 1600
312-588-7150

17