**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Laith Saud,

    *Plaintiff,*

v.

DePaul University,

    *Defendant.*

No. 19 CV 3945

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Plaintiff Laith Saud brings this employment discrimination action against his former employer, Defendant DePaul University. He alleges that DePaul failed to rehire him as an adjunct instructor and then barred him from future employment in violation of 42 U.S.C. § 1981. Before the Court are the parties' cross-motions for summary judgment, [Dkt. 205 (Defendant); Dkt. 220 (Plaintiff).][1] For the reasons that follow, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

## I.    Threshold Issues

### A.    Local Rule 56.1 Statements & Statements of Additional Facts

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

DePaul asks the Court to disregard much of Saud's Local Rule 56.1 Statement [Dkt. 241] and Statement of Additional Facts [Dkt. 258 at 40] for failing to comply with Rule 56.1. [Dkt. 249 at 8; Dkt. 263 at 6.] As a remedy, DePaul encourages the Court to treat all DePaul's facts as admitted. [Dkt. 263 at 6.]

Saud's Local Rule 56.1 Statement and Statement of Additional Facts suffer from a variety of Local Rule 56.1 violations. Many paragraphs are improperly padded with multiple facts in violation of L.R. 56.1(d)(1) ("statement of material facts … must consist of *concise* numbered paragraphs.") (emphasis added) [See, *e.g.* Dkt. 241, ¶¶ 44, 49, 57, 69.] Saud often fails to cite evidence to support the factual statements included in his Rule 56.1 Statement, and many of Saud's factual assertions misstate the record.[2] L.R. 56.1(d)(2), (e)(3). In his own Local Rule 56.1 Statement and in response to DePaul's Rule 56.1 Statement, Saud cites large sections of deposition testimony and other evidence without including pin citations. L.R. 56.1(d)(2). He also disputes as misleading and incomplete many of the facts DePaul cites in its Local Rule 56.1 Statement, but Saud's cited evidence falls far short of actually disputing

---

[2] The Court notes below where Saud's factual assertions misstate the record only slightly and the correct assertion is obvious from admissible evidence cited. In that event, the Court considers the factual assertion as true.

2

the asserted fact. L.R. 56.1(e)(3). In this way, Saud contravenes another aspect of Local Rule 56.1, which prohibits parties from setting out in their response to an asserted fact a new fact not fairly responsive to the asserted fact. L.R. 56.1(e)(2).

The Seventh Circuit "has repeatedly recognized that district courts may require exact compliance with their local rules," including the "local rules governing summary judgment." *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (collecting cases). Consistent with the purpose of Local Rule 56.1, however, the Court has "broad discretion" to relax or enforce strictly local rules governing summary judgment practice. *Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013) (citing *Modrowski v. Pigatto*, 712 F.3d 1168, 1169 (7th Cir. 2013)); *see also Cracco*, 559 F.3d at 632.

Despite these issues, and because the Court prefers to decide cases on the merits, not on technicalities, the Court will not disregard Saud's Statement of Facts or Statement of Additional Facts entirely. Nor will it accept wholesale DePaul's factual assertions. However, where plagued by the issues discussed, the Court disregards Saud's factual assertion, and where appropriate, treats DePaul's assertion as undisputed.

### B.    Admissibility

Several of the documents the parties rely on in their summary judgment motions present hearsay concerns, which the Court addresses at the outset.

First, are Karen Tamburro's notes from her interview with Saud on May 2, 2017. [Dkt. 208-13.] During her deposition Tamburro testified that when she met with Saud she took handwritten notes. [Dkt. 226-7 (Tamburro Deposition 85:15-

86:15; 119:4-11).] As was her practice, she prepared a typed version of the notes, expanding upon the shorthand she used but not otherwise changing the note's substance. [*Id.*] Saud objects on hearsay grounds. The objection is overruled. The notes themselves are business records under the hearsay exception provided in Rule 803(6) of the Federal Rules of Evidence. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021) (explaining "performance evaluations, corrective action plans, and disciplinary documents are all business records"). Tamburro testified to taking handwritten notes during the interview with Saud and then memorializing them in typewritten fashion. [*Id.* at 85:15-86:15.] From Tamburro's deposition testimony, it is clear this was her regular practice when conducting Title IX investigations for DePaul. [*Id.* at 119:4-11.]

Saud protests that the substance of Tamburro's notes differs from his own memory of their meeting and suggests that Tamburro's practice of transcribing notes is further evidence of untrustworthiness. *See* F.R.E. 803(6)(e). But Saud's differing memory of the event does nothing to contradict *Tamburro's* memory of their meeting. Tamburro's testimony about her notetaking processes confirms their trustworthiness for summary judgment purposes—at least as to Tamburro's memory of her meeting with Saud.[3] The portions of the notes that summarize what Saud said are not hearsay because they are the admission of a party opponent under Rule 801(2). Consequently, Tamburro's notes are admissible evidence, and the Court will consider them.

---

[3] Saud's related argument, that the entire Title IX investigation, including Tamburro's reports and notes, was pretextual, will be considered as part of his pretext argument.

Second are Tamburro's notes from her meetings with other DePaul administrators and students such as A.R. [Dkt. 223-12]; Khaled Keshk, Religious Studies Chair, [Dkt. 215 at DEF00214-15, DEF00217]; and Michael Van Dorp, formerly the assistant to the Religious Studies Chair [*Id.* at DEF00216]. Like the notes from Tamburro's meeting with Saud, they are business records under Rule 803(6). However, where Tamburro's notes summarize what A.R., Keshk, Van Dorp and others told her, those statements are hearsay to which no applicable exception applies.[4] *United States v. Christ*, 513 F.3d 762, 769 (7th Cir. 2008) ("[S]tatements made by third parties in an otherwise admissible business record cannot properly be admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception." (citation and internal quotation marks omitted) (cleaned up)); *United States v. Borrasi*, 639 F.3d 774, 780 (7th Cir. 2011) ("[C]ourts may not permit the introduction of hearsay contained within hearsay unless *each* layer is properly admitted under an exception to Rule 802."). Therefore, the Court disregards those portions of Tamburro's notes.

Third are the Title IX Investigation Reports—one from May 2017 and the other from October 2017. [Dkt. 223-14; Dkt. 208-26.] Like the notes, the reports are business records under Rule 803(6). The portions of the reports that rely on statements made by Saud are admissions of a party opponent under Rule 801(2). However, sections of the reports that rely on conversations with others and information learned from those conversations are hearsay and inadmissible. *See*

---

[4]  Since A.R.'s affidavit was filed in support of Saud's motion, it is appropriate for consideration on summary judgment. *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020).

*Christ*, 513 F.3d at 769; *Borrasi*, 639 F.3d at 780. That includes information shared by other students or about other students as well as information Keshk shared with Tamburro. Saud argues in passing that the reports are not admissible because they were "prepared with an eye toward litigation." [Dkt. 257 at 6.] He provides no factual support for that assertion, and the evidence presented in this case suggests otherwise. Consequently, the Court will consider the portions of those reports that are not hearsay.

Fourth are declarations DePaul attached in support of its motion for summary judgment. [Dkt. 208-1; Dkt. 208-6; Dkt. 216.] Saud asks the Court to disregard those declarations claiming they contradict the witness's testimony in a prior deposition— specifically, depositions taken in C.M.'s civil case. *See James*, 959 F.3d at 316 (discussing sham-affidavit rule).

Saud offers one example, arguing that the declarants, Valesco, Keshk, and Tamburro, attested that they did not consider Saud's race in their decision-making but made contradictory representations in deposition testimony. But Saud does not direct the Court to any contradiction, and the Court found none relevant to these motions. *See U.S. ex rel. Salazar v. Liebach*, 2002 WL 31253890, at *10 (N.D. Ill. Oct. 4, 2002) ("An undeveloped argument speaks to its paucity and the court may refuse to consider it" (citing *United States v. Jones*, 224 F.3d 621, 626 (7th Cir. 2000))).

## II.    Background

Unless noted, all facts recounted below are undisputed either because the parties agree or because of the failure to properly cite evidence refuting the fact asserted as required by Rule 56.1. Because both parties have moved for summary

judgment, when evaluating each motion, the Court must view the record in the light most favorable to the nonmovant. *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 802 (7th Cir. 2023). As explained below, if the Court views the record in Saud's favor, DePaul is entitled to summary judgment, so it is apparent that if the Court views the record in DePaul's favor, Saud's motion must be denied. Rather than present two versions of the record, and because the Court ultimately grants DePaul's motion for summary judgment, the Court presents disputed facts in the light most favorable to Saud. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). The Court only relays facts that are material. That is, "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

DePaul is a private Catholic, Vincentian university in Chicago. [Dkt. 208-1 at ¶3; Dkt. 66, ¶7.] Saud, an Iraqi Arab American, began working in DePaul's Department of Religious Studies as an adjunct instructor in 2005 or 2006. [Dkt. 226-2 (Saud Deposition 12:4-8; 20:4-12, 20:21-24; 187:15-18).] Adjunct faculty teach a maximum of two courses per quarter. [Dkt. 226-3 (Keshk Deposition 104:23-105:8).]

At some point Saud became a term faculty member in the Religious Studies Department. [Dkt. 226-2 (Saud Deposition 31:3-10).] The term faculty position is a non-tenure track position hired through annual teaching contracts which expire at the end of each academic year. [Dkt. 208-1 at ¶7.] Unlike adjuncts, term faculty teach three courses per quarter. [Dkt. 226-2 (Saud Deposition 171:3-6).] Saud's last term faculty appointment at DePaul was for the 2016–2017 academic year, running

through June 30, 2017, with possibility of renewal depending on annual performance review and/or budget availability. [Dkt. 208-9 at 2.]

Dr. Khaled Keshk was the Chair of the Religious Studies Department within DePaul's College of Liberal Arts and Social Sciences (LAS), and Guillermo Vásquez de Velasco was Dean of LAS. [Dkt. 208-8 at ¶3; Dkt. 208-1 at ¶5.] As Chair, Keshk was responsible for deciding' what courses would be taught, reviewing enrollment in courses, determining whether the course should move forward and, if so, confirming with the adjunct assigned to teach the course. [Dkt. 208-8 at ¶4.][5] The Dean is responsible for overseeing the operations of the college or school. [Dkt. 208-1 ¶4.] That includes providing input on curriculum, managing the budget, and other administrative duties. [*Id.*]

## A. DePaul's Policy

DePaul's Anti-Discrimination and Anti-Harassment Policy and Procedures (ADAH Policy) includes a section titled "Special Considerations – Consensual Relationships." [Dkt. 208-4 at 4.] It states:

> Amorous relationships that might be appropriate in other circumstances present serious difficulties within the University Community. Relationships between individuals in inherently unequal positions (such as teacher and student, supervisor and employee) may undermine the real or perceived integrity of the supervision and evaluation process, as well as affect the trust inherent in the educational environment. Consensual romantic or sexual relationships in which one party is in a position to review the work or influence the career of the other may

---

[5]     Saud disputes this assertion as incomplete and misleading, (*see* dkt. 258, ¶ 18), claiming that the Chair reports to the Dean, is limited to the budget set by the Dean, and the Dean is "always involved" in the hire of adjuncts. In support Saud cites Keshk's deposition where Keshk testified that the Dean's Office was "always involved" in disciplining or terminating an adjunct. [Dkt. 226-3 (Keshk Deposition 17:3-16.] Because Saud's citations do not contradict DePaul's, the Court deems DePaul's fact admitted.

provide grounds for complaint when that relationship gives undue access or advantage to, restricts opportunities of, or creates a hostile and unacceptable environment for one of the parties to the relationship, or for others.

In such circumstances, consent may not be considered a defense against a charge of sexual harassment in violation of this Policy. The determination of what constitutes sexual harassment depends upon the specific facts and the context in which the conduct occurs. [*Id.*]

Subject to the above "Special Considerations," DePaul's ADAH Policy does not explicitly prohibit relationships between faculty and students when the student is currently enrolled in the faculty member's course.[6] [*Id.*]

## B.    January 2017 On-Campus Event

In January 2017 Saud planned an on-campus discussion entitled "Muslim American Civil Liberties in the age of Trump." [Dkt. 224-7.] On January 18, 2017, Linda Blakley, DePaul's VP of Marketing and Communications learned of the planned event from a subordinate who forwarded her a flier explaining that while "[t]he language in the flier does not suggest it is specifically in protest of Trump's inauguration … it is the same day and Saud has been vocal about his dislike for Trump." [Dkt. 224-4 (Blakley Deposition 49:17-50:10); Dkt. 224-7.] The same day, Blakley forwarded the email and the event flyer to other administrators at DePaul

---

[6]    At SOF No. 3, Saud asserts that "DePaul's ADAH Policy does not prohibit consensual relationships between faculty and students, even where the student is currently enrolled in a course instructed by the faculty member." [Dkt. 250 at 2.] DePaul disputes this fact, citing to the policy language. [*Id.*] Saud's SOF is not fully supported by the ADAH Policy language. In the "Consensual Relationships" section, the Policy states that "consent may not be considered a defense against a charge of sexual harassment in violation of this Policy." [Dkt. 208-4 at DEF00050.] Therefore, while consent is not always relevant when evaluating the permissibility of the amorous relationship, Saud is correct that the policy does not include a blanket prohibition on relationships between faculty and students. Therefore, the Court views Saud's factual assertion to align with the undisputed evidence and to permit it to consider this evidence in the light most favorable to him.

including the Office of Institutional Diversity and Equity (OIDE). [Dkt. 224-7; Dkt. 224-4 (Blakley Deposition 51:9-22).]

### C. Campus Watch Article

On April 6, 2017, a website, *Campus Watch*, published an article about Saud teaching at DePaul, as well as his midwestern upbringing as an Arab American, and political views.[7] [Dkt. 224-11.] DePaul contracts with a third-party vendor to monitor news and reports about DePaul and forward any to Blakley's department. [Dkt. 224-4 (Blakley deposition 46:20-47:2).] DePaul may have received a link to the *Campus Watch* article about Saud through the third-party vendor, but Blakley did not recall seeing it. [*Id.* at 48:9-15.]

### D. The Non-Renewal of Saud's Term Faculty Contract

On April 10, 2017, the Religious Studies Department completed Saud's annual review, which indicated that the Personnel Committee and the Chair of the Religious Studies Department voted to renew him for a one-year term faculty position. [Dkt. 224-6.] On the same day, however, Dean Velasco sent Saud a letter informing him that he would not be reappointed for academic year 2017–2018 due to budgetary constraints within the college. [Dkt. 208-10 at 2.] As a result, Saud's then-current appointment would end on June 30, 2017, in accordance with his contract. [*Id.*] The Dean nonetheless thanked Saud for his dedication to students' education and noted that his department's review reflected favorably on his instructional and collegial

---

[7]      DePaul objects to this evidence on hearsay grounds, but that objection is overruled. Saud is not relying on the article for its truth, but rather for its alleged impact or effect on DePaul administrators. *See United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015).

performance. [*Id.*] Another term faculty member in the Religious Studies Department, David Lysik, was also informed that his contract would not be renewed for budgetary reasons. [Dkt. 226-3 (Keshk Deposition 96:5-25).]

The following day, April 11, 2017, Keshk contacted DePaul administrators about retaining Saud and Lysik as adjuncts for the fall quarter. [Dkt. 224-28.] The highest pay Keshk was authorized to offer an adjunct was $4,800 per course. [Dkt. 208-11 at 2.] Dean Velasco's approval was needed for adjuncts to be paid more. [*Id.*]

### E.    First Title IX Investigation

On April 10, 2017, an attorney sent a letter to Saud and DePaul claiming that Saud had committed "repeated acts of sexual misconduct and reckless behavior" against C.M., "a student taking one of [his] classes." [Dkt. 208-12 at 2.]

A copy of the letter made its way to Karen Tamburro, DePaul's Title IX coordinator who sits within DePaul's OIDE. [Dkt. 208-6 at ¶3.] She was responsible for investigating complaints and concerns of sexual discrimination, sexual harassment, and sexual and relationship violence impacting DePaul students and faculty under DePaul's ADAH Policy. [*Id.*] Tamburro opened an investigation into C.M.'s claim. [Dkt. 226-7 at 35-36, 50-51, 57 (35:10-12, 36:2-6, 50:14-51:9, 57:6-8).]

Tamburro interviewed Saud about C.M.'s allegations on May 2, 2017. [Dkt. 226-7 (Tamburro Deposition 199:20-200:1, 204:6-10).] She took handwritten notes using shorthand during the interview and prepared a typed version of her notes after the interview, which stated, in part:

> Prof al Saud stated that a sexual relationship developed [with C.M.] in mid-June 2016, after the course ended and she was no longer a student ... Prof. al Saud stated that they had sex on two separate

11

occasions in his home in June 2016. He stated that the sex was consensual … Prof al Saud stated that [C.M.] did not return to DePaul in fall 2016.

[Dkt. 208-13 at 2–3; Dkt. 226-7 (Tamburro Deposition 85:25-86:15).]

C.M.'s attorney informed Tamburro that his client would not participate in DePaul's investigation and directed Tamburro not to contact C.M., so C.M. did not participate in DePaul's investigation. [Dkt. 226-7 (Tamburro Deposition 56:19-57:5); Dkt. 224-19 at DEF00069-70.]

Tamburro's investigation encompassed a second report concerning Saud and DePaul student, A.R., which was brought to her attention on April 12, 2017. [Dkt 226-7 (Tamburro Deposition 36:2-6, 50:6-17); Dkt. 223-9.] Tamburro met with A.R. on April 18, 2017. [Dkt. 226-10.] A.R. denied anything physical occurred between her and Saud and explained no conduct occurred that made her feel uncomfortable. [Dkt. 223-12.] From the meeting with Tamburro, A.R. got the impression that "[DePaul was] trying to build a case against Laith Saud." [Dkt. 223-18.]

On May 9, 2017, Tamburro finalized a written report summarizing her investigation. [Dkt. 226-7 (Tamburro Deposition 72:5-17).] In it she explained there was insufficient evidence to support a finding that Saud engaged in a sexual offense, sexual misconduct, or sexual harassment with respect to C.M. as those terms are defined in DePaul's ADAH Policy. [Dkt. 214 at 6-8.] The report stated, in part,

> The information presented supports that Prof. al Saud did not request or solicit, directly or indirectly that [C.M.] engage in a sexual relationship with him while she was a student in his class. No information suggests that a sexual relationship was connected to [C.M.'s] participation in the class or the grade she received in the class.

[*Id*. at 6.] The report reached the same conclusion about A.R. [Dkt. 223-14 at 5.]

Tamburro notified Saud of her findings on May 10, 2017. [Dkt. 208-15 at 2.] Saud, in turn, notified Keshk that he was cleared. [Dkt. 226-2 (Saud Deposition 191:20-192:9).]

### F. Adjunct Contract Negotiations

On May 2, 2017, before Tamburro's report was finalized, Keshk's assistant notified the administration that the Religious Studies Department wanted to cancel all three of Saud's upcoming courses but only one of Lysik's courses—the other Religious Studies Department term faculty member whose contract had not been renewed. [Dkt. 224-30 at 1-2.] Two of Saud's courses were relisted and assigned to "STAFF." [*Id.*] When Saud inquired about it, Keshk told him "[w]e cancelled the term faculty classes now so that we don't have to do it at the last minute." [Dkt. 224-13.]

On May 17, 2017, after Tamburro's report was finalized, Saud emailed Keshk's assistant about scheduling his courses for the Fall 2017 quarter. [Dkt. 164-33.][8] Keshk replied informing him that his courses had been "taken off and now we are trying to reschedule you." [*Id.*] He asked if Saud could teach REL 265 and REL 224 on Tuesdays and Thursdays. [*Id.*] Saud replied, "Sounds great." [*Id.*] A few weeks later, the Dean's office contacted Keshk, explaining:

> An adjunct position was created for David Lysik, so he may be terminated in the system from his full-time role [if you have not already done so]. … Laith Saud's adjunct position was terminated and I'm reinstating it today. I'll confirm when that is done and then you can terminate him in the system… [Dkt. 224-35.]

---

[8] Saud did not attach Exhibit 44 to his present motion but did for his earlier summary judgment filing. The Court relies upon this filing.

On June 8, 2017, Saud emailed Keshk about the possibility of receiving more than $4,800 per course as an adjunct. He wrote, "After doing some investigating and speaking with folks on campus, 'enhanced pay' has come to my attention for adjuncts. Is this something we could look into?" [Dkt. 208-17 at 2.] A few weeks later, on June 28, 2017, Saud emailed Keshk again, explaining, "I am aware the Dean's office does approve pay above the $4,800 mark. Katie [Kutina from the Dean's office] instructed me that the process for me to request such pay should begin with my department chair." [Dkt. 208-18 at 2.]

On June 28, 2017, Keshk asked Saud and Lysik what a "fair" amount would be for their adjunct salary and informed them that he would "send a letter soliciting that amount from the Dean." [Dkt. 208-19 at 3.]

### G.    C.M.'s Lawsuit

The next day, on June 29, 2017, C.M. filed a lawsuit against Saud and DePaul, asserting claims for battery, negligence, and violation of the Illinois Gender Violence Act. [Dkt. 208-20.] Her lawsuit alleged, in part, that on April 15, 2016, while she was a student in Saud's class, she and Saud had dinner where he "plied [her] with alcohol in an attempt to get her intoxicated"; after dinner Saud took her to his home and "began to aggressively seek sexual relations with [her]," and Saud "had sexual intercourse with [her] at that time." [*Id.* at ¶7.] C.M.'s complaint also alleged that Saud told her he would give her an A in his class and that she did not have to take the final exam. [*Id.* at ¶9.]

14

The same day C.M. filed her suit, the Chicago Sun Times published an article about it. [Dkt. 208-8 at ¶5.] Keshk learned of the lawsuit on June 30, 2017. [Dkt. 226-3 (Keshk Deposition 185:1-4).]

## H.    Continued Adjunct Pay Negotiations

On July 1, 2017, Saud replied to Keshk's June 28, 2017, email and requested $6,000 per course. [Dkt. 208-19 at 3.] Lysik requested $37,529 per year which equates to $6,254.83 per course. [Dkt. 226-20.] Keshk forwarded Lysik's request to someone at the Dean's office. [*Id.*] Keshk testified that he forwarded Saud's request to the Dean's office, too, but aside from this testimony, there is no written record of Keshk doing so.[9] [Dkt. 226-3 (Keshk Deposition 141:8-19).]

On July 5, 2017, Keshk contacted Tamburro to advise her that he received two reports regarding Saud after the publication of the Chicago Sun Times article.[10] [Dkt. 226-12 at 1.]  The following day, Keshk sent Saud this email:

Dear Laith,

Thank you for your note. I must inform you that I cannot offer you a course assignment for the Fall Quarter. In addition to low projected course enrollments, and thus uncertainties about final course offerings, your compensation requirements far exceeds what I am able to pay adjunct instructors.

Should an assignment that would be suitable for you become available, I will contact you to discuss your availability. In the meantime, I suggest that you pursue other opportunities, as I do not know if any suitable

---

[9]    Saud's SOF No. 32 asserts "there is no record Keshk forwarded or otherwise relayed Saud's enhanced pay request to the Dean." [Dkt. 250 at 12–13.] The Court views Saud's assertion to align with the evidence.

[10]   Saud objects to the statement on hearsay grounds. He is correct that the substance of the reports is inadmissible hearsay. However, the fact that reports were made to Keshk is not offered for the truth of any matter asserted in the reports but instead for its impact on both the Title IX investigation and Keshk's decision with respect to Saud's employment.

assignments will be available a DePaul in the immediate future. [Dkt. 208-19 at 2]

At his deposition, Keshk testified that C.M.'s "case" was a "black cloud over [Saud's] head" at the time Keshk decided not to hire him as an adjunct for the 2017 Fall Quarter. [Dkt. 226-3 (Keshk Deposition 146:12-147:19).] Keshk testified that C.M.'s lawsuit was a factor in his decision not to hire Saud as an adjunct for the 2017 Fall Quarter, but that he did not include it in his email to Saud because he was not sure if he had "the right" to discuss the lawsuit with Saud. [*Id.* at 147:11-19.] He did not feel comfortable having Saud teach in the classroom, and "would always have been very fearful that those allegations were actually correct." [*Id.* at 264:1-22.]

## I.     Second Title IX Investigation

On August 21, 2017, Tamburro sent Saud a letter explaining, "OIDE obtained additional information concerning the allegations made by [C.M.] concerning you. Based on the information, OIDE is initiating further investigation." [Dkt. 208-24 at 2.] Tamburro's letter went on:

> Specifically OIDE is investigating an allegation that you engaged in sexual harassment of [C.M.] by initiating a dating relationship while she was a student enrolled in your class, initiating sexual acts with her both on and off campus while she was a student enrolled in your class, and promising her a grade of an A, in absence of taking the final in [your] class due to your relationship with her.

[*Id.*] The letter requested an interview with Saud by September 1, 2017. [*Id.* at 3.]

On September 1, 2017, Saud emailed Tamburro a copy of the verified Answer he filed in C.M.'s lawsuit. [Dkt. 208-25 at 2.] He declined the interview request on the advice of counsel given that the investigation related to C.M.'s civil suit but forwarded

16

his verified Answer so that Tamburro could "review [his] position with respect to the most recent allegations." [*Id.*]

Saud's Answer admitted that while C.M. was a student in his class during the spring 2016 quarter, he sent her an email asking to get a drink and she agreed. [*Id.* at 4.] Saud also admitted that at an unspecified time he and C.M. had sex. [*Id.* at 8.] Saud's Answer left open the question of whether C.M. was still a student in his class when they had sex. Tamburro did not contact Saud about any potential discrepancy between his pleadings and the statements he made during his May interview, namely that the relationship developed in mid-June 2016, after the course ended and C.M. was no longer a student. [Dkt. 226-7 (Tamburro Deposition 146:11-25).]

C.M.'s attorney informed DePaul that C.M. did not wish to participate in an interview related to the second Title IX investigation. [*Id.* at 109:19-21.]

On October 5, 2017, Tamburro issued her report which found by a preponderance of the evidence that Saud subjected C.M. to sexual harassment. [Dkt. 208-26 at 10.] That conclusion was based in part on Tamburro's finding that Saud was inconsistent about when the sexual relationship began: Saud initially reported to Tamburro that it began in mid-June 2016, but this date was omitted from his Answer to C.M.'s complaint. [Dkt. 226-22 at 9.] She notified Saud by email the following day about the outcome of the investigation and informed him that Keshk and Dean Velasco would contact him to discuss the consequences. [Dkt. 208-27 at 2–3.]

On October 23, 2017, Saud received a letter from Dean Velasco informing him that as a result of the Title IX investigation, he was no longer eligible for future employment at DePaul. [Dkt. 226-2 (Saud Deposition 335:17-336:1; 342:6-23).] In addition, Dean Velasco informed Saud that he could not provide formal or informal instruction in any classroom-based or co-curricular activities sponsored by DePaul. [Dkt 224-57.]

A trial was held in C.M.'s lawsuit in April 2019. A judge found against C.M. on her claims and in Saud's favor on his counterclaim for defamation. [Dkt. 250 at 24 (SOF #68).]

This lawsuit followed.

## II.    Legal Standard

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. On the other hand, summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v.*

18

*CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

### III. Analysis

Saud brings a race discrimination claim against DePaul based on 42 U.S.C. § 1981. "Section 1981 … protects the right of all persons to make and enforce contracts regardless of race." *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411 (7th Cir. 2018) (citation and internal quotation marks omitted). The statute "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." *Circle City Broad. I, LLC v. AT&T Servs., Inc.*, 99 F.4th 378, 383 (7th Cir. 2024) (citation and internal quotation marks omitted).

At summary judgment, the pertinent question is whether a reasonable juror could conclude that Saud would have been hired as an adjunct professor for the fall of 2017 and not barred from future employment at DePaul "if he had a different ethnicity, and everything else had remained the same." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016); *see also Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022). To defeat summary judgment, Saud "must either provide enough evidence to permit a reasonable factfinder to conclude that [his] race caused the … adverse employment action," under *Ortiz*, 834 F.3d at 765, or shoulder his

burden under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)." *Oliver*, 893 F.3d at 411–12 (cleaned up).

Saud alleges there are two distinct adverse actions at issue in this case: first, DePaul's decision not to hire him as an adjunct in Fall 2017, and second, DePaul's decision to bar him from future employment.[11] The Court addresses each adverse action separately below.

### A.    Race Discrimination in Fall 2017 Adjunct Hiring

Saud first alleges that in the summer of 2017 he was not hired to be an adjunct instructor for the Fall 2017 quarter on account of his race. Under *McDonnell Douglas*, Saud must establish a *prima facie* case of racial discrimination by showing: (1) he is a member of a protected group; (2) he was qualified for the position and (3) he suffered an adverse employment action; and (4) other similarly situated persons who were not members of Saud's protected class were treated more favorably. *Gamble v. Cnty. of Cook*, 106 F.4th 622, 626 (7th Cir. 2024); *Oliver*, 893 F.3d at 412. If plaintiff carries his initial burden it moves "to the employer to articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas Corp.*, 411 U.S. at 802. Then the burden shifts back to plaintiff "to demonstrate that [his employer's] reason was pretext to hide a discriminatory motive." *Oliver*, 893 F.3d at 41.

---

[11]    Saud argues Tamburro's allegedly discriminatory investigation constitutes an independent adverse employment action. [Dkt. 242 at 6.] *Muldrow v. City of St. Louis* requires that the at-issue action "brought about some 'disadvantageous' change in an employment term or condition." 601 U.S. 346, 354 (2024). The Court considers these arguments as part of its pretext analysis.

1.   ***Prima Facie* Case**

Both Saud and DePaul agree that Saud satisfies the first two elements of the *prima facie* case. He is a member of a protected class on account of his race, [Dkt. 250, ¶ 4], and he was subjected to an adverse action when he was not rehired to teach as an adjunct. *Oliver*, 893 F.3d at 413.

There is sufficient evidence in the record to suggest that Saud was qualified for the position. In 2016, Saud received an evaluation of "good" on his department review. [Dkt. 224-46.] His review from the spring of 2017 also indicates that his department was prepared to recommend to the Dean that his one-year term faculty position contract be renewed. [Dkt. 224-6.] It was common for his classes to have a waitlist. [Dkt. 224-58 (C.M. Trial Testimony 62:6-7).] He was also frequently recommended by his peers for speaking engagements. [Dkt. 224-2 (Keshk Deposition 91:14-170).] While there may be valid reasons for DePaul to categorically prohibit a person from teaching when facing a lawsuit like the one C.M. filed against Saud, as DePaul argues, *see C.S. v. Madison Metropolitan School District*, 34 F.4th 536, 542 (7th Cir. 2022), there is no evidence of such a DePaul policy here. [Dkt. 209 at 12-13.]

To complete his *prima facia* case, Saud must identify comparators—similarly situated persons not a member of Saud's protected class who were treated more favorably. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 575 (7th Cir. 2021). "Although similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019). In most cases "material respects" means that plaintiff and his comparator "(1) dealt with the

same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (cleaned up). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Id.* That is the case here.

Saud points to David Lysik as a comparator who was treated better, but Lysik did not engage in similar conduct and mitigating circumstances explain DePaul's different treatment of him.

Lysik was a white male professor in the Religious Studies Department. [Dkt. 226-3 (Keshk Deposition 98:11-16).] In early 2014, DePaul's Public Safety office received information about a comment posted on a public Facebook page entitled "DePaul Confessions." [Dkt 216, ¶4.] The comment by "Donny Juan" said "PROFESSOR LISACK a DePaul Catholick [sic] studies Teacher RAPED ME." [*Id.*, ¶¶4,5.] Then-Vice President of OIDE, Barbara Schaffer, was assigned to investigate. [*Id.*, ¶4.] The case report Schaffer received from the Public Safety office explained, "The accused name is not found in DePaul University Directory. The only name found in DePaul University Directory that is similar is David Lysik of Re[l]i[g]ious Studies." [*Id.*, ¶4.] DePaul also could not locate any student with the name "Donny Juan." [*Id.*, ¶5.]

On May 2, 2014, Lysik emailed Schaffer informing her that he located a professor at another university, Dr. David Lisak, whose research specialty is rape. [Dkt. 217 at 2.] On June 2, 4014, Schaffer told Lysik that OIDE closed the case because it was "unable to turn up any other information." [*Id.*] Neither Keshk nor the Dean made any decisions related to Lysik's employment at DePaul in 2014.[12] Lysik was permitted to continue teaching after the investigation closed.

There are material differences between the allegations against Lysik and Saud that, taken together, confirm Lysik is not a valid comparator. The allegation against Lysik was made on a Facebook page while the allegation against Saud was made by an attorney representing the complainant. DePaul could not identify the person making the complaint against Lysik but could identify C.M. Because of the misspelling, the subject of "Donny Juan's" allegation was unclear. In contrast, C.M.'s allegation was unequivocally against Saud, and Saud admitted to having sex with C.M. during his interview with Tamburro—substantiating part of C.M.'s claim. A more appropriate comparator would be an identifiable faculty member who was accused of misconduct by a known or identified student but who was nonetheless permitted to teach as an adjunct. As a result of these significant differences, the fact that Lysik was permitted to continue teaching at DePaul "does not suggest anything 'fishy' about" DePaul's decision to not rehire Saud as an adjunct instructor. *Bless*, 9 F.4th at 575. Because there is an absence of evidence from which a jury could find

---

[12]      Plaintiff's objection to this statement of fact is overruled because he fails to cite evidence refuting DePaul's factual assertion specifically as to Lysik in the year 2014.

Lysik to be a similarly situated comparator, Saud has failed to establish a *prima facie* case of race discrimination under § 1981.

### 2.    Pretext

*McDonnell Douglas* framework aside, DePaul has offered a non-discriminatory reason for the employment decision, so Saud must offer evidence from which the jury could find that the explanation is pretextual. *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024) (cleaned up); *Ortiz*, 834 F.3d at 765.

DePaul's "legitimate nondiscriminatory rationale" for not rehiring Saud was that he was being sued for coercing a student, C.M., into having sex with him, and admitted to having sex with her. It argues that the evidence shows Keshk proceeded with the idea of hiring both Saud and Lysik as adjuncts but abandoned the plan days after C.M. filed her lawsuit. [Dkt. 208-19 at 2–3.]

Saud has the burden to show that DePaul's non-discriminatory reason was dishonest and the true reason was based on a discriminatory intent. *Logan v. City of Chicago*, 4 F.4th 529, 537 (7th Cir. 2021) (citation and internal quotation marks omitted). Pretext is "a dishonest explanation, a lie rather than an oddity or an error." *Vassileva*, 118 F.4th at 874; *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) ("[P]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." (cleaned up)). The question "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action," *Liu v. Cook County*, 817 F.3d 307, 316 (7th Cir. 2016) (cleaned up). "A plaintiff may show a genuine dispute of fact on pretext

by identifying such weaknesses, implausibilities, inconsistencies, or contradictions in a stated reason that a reasonable trier of fact could find it unworthy of credence." *Id.* (cleaned up).

First, Saud directs the Court's attention to Keshk's shifting explanations for why he was not rehired. A jury can "reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). In his July 6, 2017 email to Saud, Keshk listed two reasons for his decision not to offer Saud course assignments for the upcoming quarter. First, that Saud asked for too much money, and second that "low projected course enrollments" resulted in "uncertainties about final course offerings." [Dkt. 208-19 at 2] At his deposition, Keshk stated that C.M.'s "case" was a "black cloud over [Saud's] head" and influenced his decision not to rehire Saud. [Dkt. 226-3 (Keshk Deposition 146:12-147:19).] According to Keshk, he did not reference the lawsuit in his email because he wasn't sure if he had the right to discuss it with Saud. [*Id.*]

To be evidence of pretext, the explanations must be inconsistent so as to "permit an inference of mendacity." *Davenport v. Northrop Grumman Sys. Corp.*, 281 F. App'x 585, 588 (7th Cir. 2008); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016). The shifting explanations Saud points to—pay requirements, low projected enrollment, and the recently filed lawsuit—would not permit the inference that DePaul's reasons were dishonest, or a "mask" for illegal discrimination.

25

Regarding "low projected course enrollments," there is no evidence that Keshk's assertion about low projected course enrollments was a lie. Saud argues that Keshk manufactured low enrollment by cancelling Saud's courses in May 2017, before Saud requested enhanced adjunct pay. [Dkt. 242 at 10.] But Keshk worked with the Dean's office to cancel Saud's term faculty courses and faculty member status in the system because his term faculty contract had not been renewed. This was done so that the courses could be relisted, and Saud could be added to the system as an adjunct professor and continue teaching.[13]

On the money front, Saud sees as pretextual DePaul hiring Lysik as an adjunct when he requested more money per course. It is true Lysik requested $37,529 per year or $6,254.83 per course, (*see* dkt. 226-20), but Lysik ultimately accepted just $4,800 per course, which is less than what he or Saud requested. [Dkt 208-23 at 2.]

No reasonable fact finder could conclude that these reasons were pretext (*i.e.*, dishonest), even in light of Keshk's subsequent deposition testimony. Keshk did not disown the reasons listed in his email. [Dkt. 226-3 (Keshk Deposition 146:6–147:19).] And even if Keshk's email wasn't the full story of why Keshk refused to rehire him, Saud offers no evidence of an impermissible motivation. *Vassileva*, 118 F.4th at 874. In other words, the "shift" Saud identifies does not mean a reasonable jury could find that "the real reason [for the adverse employment action] was discriminatory." *Stockwell v. City of Harvey*, 597 F.3d 895, 901–02 (7th Cir. 2010).

---

[13] Similarly, Saud's factual assertion that it was common for his courses to have waiting lists does not disprove Keshk's claim that in the summer of 2017 his courses had low projected enrollment. [Dkt. 224-58 (C.M. Trial Testimony, 62:6-7).]

26

Next Saud points to irregularities in DePaul's processes. He argues that DePaul's cancellation of his courses in May 2017 proves that it decided not to rehire him before C.M. filed her lawsuit and therefore, its alleged nondiscriminatory reason for its decision was pretextual. He also points out that in May 2017, DePaul cancelled all three of Saud's fall 2017 courses and relisted two of them as assigned to "STAFF."[14] Lysik, whose term faculty contract was also not renewed due to budget constraints, only had one of his courses cancelled. In support, Saud highlights Keshk's inability to explain at his deposition why Saud and Lysik received different treatment. [Dkt. 226-3 (Keshk Deposition 165:17-22).]

An employer's "unusual deviation from standard procedures can serve as circumstantial evidence of discrimination." *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017). To show pretext, there must be evidence permitting a jury to infer that the true motive for DePaul's actions were illegal discrimination. *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 747 (7th Cir. 2021). Keshk's statements would not permit a jury to infer such a motive. Assuming that the decision to cancel Saud's courses for the upcoming quarter deviated from ordinary procedures or resulted in unfair treatment, they have nothing to do with race. Nor is there evidence suggesting that the differences were intended to "cover up more nefarious motives." *Id.*

As explained above, DePaul's cancellation of Saud's term faculty courses does not support the inference that DePaul had decided to fire him in May 2017. From late May until late June 2017, Keshk and others at DePaul communicated about relisting

---

[14]     Recall that term faculty teach three course per quarter while adjunct instructors teach only two. [Dkt. 226-2 (Saud Deposition 171:3-6); Dkt. 226-3 (Keshk Deposition 104:23-105:8).]

Saud in the system as an adjunct professor with adjunct courses Saud could continue to teach. [Dkt. 224-13; Dkt. 224-35.] Salary negotiations concerning enhanced adjunct pay continued throughout this time period. [Dkt. 208-17 at 2; Dkt. 208-18 at 2.] While DePaul's practice of cancelling term faculty members and reinstating them as adjuncts may be cumbersome, inconsistent, or poorly executed, Saud is unable to tie any process issues to race, which is fatal to his argument. *Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 390 (7th Cir. 2020) (explaining that even if the employer's "process was not accurate, wise, or well-considered" does not make it pretextual).

Saud offers other scattershot arguments aimed at establishing Keshk's motives were discriminatory. None hit the mark. He asserts—without citation—that (1) his January 2017 event on campus about Muslim civil rights was flagged to high-level administrators; (2) days before he was accused he was the subject of a *Campus Watch* article; (3) DePaul never informed Saud of additional complaints when it reopened his investigation in August 2017; (4) Keshk was up for reappointment in June 2017; (5) Keshk has a pattern of ignoring faculty discrimination concerns, but was aware of them; (6) Keshk believed Saud would "throw [him] under the bus" and (7) Saud was not afforded an appeal. [Dkt. 257 at 12.] But without any evidence of discrimination—specifically, evidence that Keshk's decision was based Saud's race—Saud's critiques of Keshk fall short. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 597 (7th Cir. 2017) (explaining that "mere conjecture and speculation" is insufficient to support race discrimination claim).

On this record, no jury could find that illegal discrimination was why DePaul decided not to permit Saud to teach as an adjunct. Even when the record is viewed in Saud's favor and the evidence is considered "in a single pile," a factfinder could not reasonably conclude that the adverse employment action was because of Saud's race. *Ortiz*, 834 F.3d at 766.

## B. Race Discrimination Regarding Future Employment

Saud also argues that DePaul violated § 1981 when Dean Velasco, after the conclusion of the second Title IX investigation in October 2017, decided Saud was ineligible for future employment at DePaul. The Court considers this claim under both the *McDonnell Douglas* and *Ortiz* standards.

### 1. *Prima Facie* Case

The same *prima facie* requirements discussed above apply. Saud is undisputedly a member of a protected class,[15] and the parties also do not dispute that being deemed ineligible for future employment is an adverse employment action. [Dkt. 209 at 16; Dkt. 266 at 5.]

There is evidence, as discussed above, that Saud was qualified for future employment with DePaul. Though DePaul argues that the Title IX investigation determined Saud had violated DePaul's Policy with respect to C.M., it fails to cite evidence that violating the policy renders an instructor ineligible for future employment. The ADAH Policy itself includes no such provision.

---

[15] DePaul argues, relying on Dean Velasco's declaration, that the Dean was unaware of Saud's race and therefore could not have impermissibly considered it. [Dkt. 208-1 at ¶1.] Saud counters that his name reflects his race. Since Saud's § 1981 claim can be resolved in other ways, the Court assumes Dean Velasco was aware of Saud's race.

Saud must also identify comparators—that is, someone who DePaul found violated the policy but was not deemed ineligible for future employment. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (explaining the purpose of identifying comparators "is to eliminate other possible explanatory variables" for the employer's decision "such as differing roles, performance histories, or decision-making personnel").

Saud points to Lysik as a comparator, but as already discussed there are too many distinctions between them. Comparators need not "be identical in every conceivable way," but the differences between Saud, who was found to have violated the policy, and Lysik, who was not, "render[s] the comparison effectively useless." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Put another way, evidence of Lysik's treatment does not eliminate the possibly that DePaul made its decision with respect to Saud's future employment because of his policy violation rather than on account of his race.

Alternatively, Saud identifies Joseph Suglia, another white professor at DePaul. In 2015, Tamburro headed an OIDE investigation into a complaint that Suglia engaged in "verbal exchanges … of an explicit sexual nature" with a student no longer enrolled in his course. [Dkt. 218 at 2.] OIDE determined Suglia violated the "Consensual Relationship" portion of DePaul's ADAH Policy and issued several sanctions against Suglia, including a determination that he was not eligible for rehire at DePaul. [*Id.* at 3.]

Suglia's ineligibility for future employment with DePaul means that he is not a suitable comparator. Indeed, evidence of Suglia's treatment supports the conclusion that DePaul barred from future employment individuals who violated its ADAH Policy, regardless of their race. A comparison with Suglia also fails because a different decisionmaker meted out his punishment—his department Chair, not the Dean of LAS. [Dkt. 218 at 3.] *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff."); *Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (holding that "to be an adequate comparator" plaintiff would need to show the comparator "was treated more favorably … by the same decisionmaker"). So Saud cannot establish his *prima facia* case for this reason either.[16]

### 2.    Pretext

The Court next considers Saud's argument that DePaul's reason for barring him from future employment was pretextual.[17] His pretext arguments generally fall into the following categories: how DePaul conducted its investigation; discrepancies with Tamburro's recordkeeping and investigation practices; his disparate treatment

---

[16]    Saud argues that he was subjected to a worse outcome than Suglia because he was also prohibited from participating in DePaul sponsored events. Assuming being barred from sponsored events is a separate adverse employment action, Suglia still is not a suitable comparator because a different decisionmaker decided on his punishment. Consistent with *Ortiz*, however, the Court discusses the different treatment in its pretext discussion below.

[17]    Saud's briefing leaves murky what pretext arguments relate to which adverse employment action. The Court has endeavored to sort them out, giving Saud the benefit of the doubt wherever possible. *See Patterson v. Howe*, 96 F.4th 992, 999 (7th Cir. 2024) ("It is not the courts' responsibility to develop an argument for a party.")

during the investigation; and general allegations concerning DePaul's ongoing history of discriminating against minorities. Ultimately, even in combination, this evidence does not permit an inference of race discrimination. *Ortiz*, 834 F.3d at 764.

### i. Investigation Discrepancies and Errors

In her October Title IX Report, Tamburro determined that Saud lacked credibility on when the sexual relationship with C.M. began. That determination underpinned the finding that Saud violated DePaul's policy and, in turn, the Dean's ultimate decision regarding future employment.

To demonstrate pretext, Saud takes aim at Tamburro's negative credibility determination, which was based primarily on the conflict Tamburro identified between what Saud told her during his May interview and the information contained in Saud's verified Answer filed in September. The Answer did "not provide a timeframe for when the sexual relationship [with C.M.] began," but Tamburro's interview notes indicate that Saud "reported that the sexual relationship began sometime in mid-June 2016 when [C.M.] was not a student enrolled in his course." [Dkt. 226-22 at 4.]

Saud says that Tamburro manufactured a conflict between the interview notes and Saud's Answer by purposefully taking inaccurate notes. Even assuming this were true, it does not reveal pretext. Setting aside that the notes formed the basis for the May Report that *cleared* Saud, any inaccuracies were, at worst, a mistake; there is no evidence they were a "phony excuse." *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (holding that a "mere mistake by an employer does not constitute

32

pretext; instead, pretext "is a phony excuse.") Nor does Saud identify anything about the notes that reveal a discriminatory motive. *Tyburski*, 964 F.3d at 599 ("Tyburski has pointed to no evidence of improper motivation, other than the interviewers' knowledge of his age relative to that of the other candidates. This is not enough.") Put differently, even a "false report ..., standing alone, is insufficient to establish discriminatory animus." *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 273 (7th Cir. 2023).

Saud also notes there was no inconsistency between the statements he made to Tamburro during the May interview and his verified Answer, which did not specify a date when Saud had sex with C.M. [Dkt. 257 at 15.] This, Saud suggests, means that Tamburro's conclusion that he lacked credibility was inaccurate because there was no conflict. But again, "faulty reasoning or mistaken judgment on the part of the employer" is insufficient to show pretext. *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015). To survive summary judgment, Saud must point to evidence permitting an inference of discriminatory animus. *Chatman*, 5 F.4th at 747 (pretext argument failed because plaintiff could not "persuasively assert that the Board's decision to eliminate the position was driven by discriminatory animus.")[18] He has not done so on this record.

Saud's other arguments attacking the way in which Tamburro reached her conclusion about his lack of credibility fare no better. He argues that Tamburro and

---

[18] Saud's argument that Tamburro should have contacted him to inquire about the perceived inconsistency (*see* dkt. 208-25 at 2) or should have viewed his Answer through the lens of an attorney-drafted document (*see* dkt. 266 at 12) are unpersuasive for the same reason.

Keshk's testimony at C.M.'s trial was inconsistent, with each claiming that they relied on information supplied by the other to determine that Saud lied. [*Compare* Dkt. 242 at 11 *with* Dkt. 257 at 15.] As discussed, shifting or inconsistent explanations can demonstrate pretext when they permit an inference of mendacity, but Saud fails to meaningfully develop any argument or point to any evidence from which a jury could infer dishonesty from the differing testimony. Undeveloped arguments like this one are waived. *Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) ("We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived.")

Lastly, because Saud has not shown Tamburro was biased, his cat's paw theory of liability also fails. Under this theory, "when a biased subordinate lacks decision-making power to [take adverse action against] an employee, but uses a formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action, [the Court] will consider the biased subordinate's actions as direct evidence of discrimination." *Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (cleaned up). To prove the theory, the plaintiff must show: "(1) the biased subordinate actually harbored discriminatory animus against [him]; and (2) "the subordinate's input was a proximate cause of the adverse employment decision." *Bragg*, 58 F.4th at 273 (cleaned up).

Without evidence that Tamburro, the allegedly biased subordinate, expressed racial bias towards Saud or acted in some discriminatory manner, Saud does not "get past the first step in the cat's-paw theory." *Id*. at 274. The absence of evidence that

34

Tamburro was racially biased in her investigation is fatal to Saud's assertion that Dean Velasco was used as a dupe.[19]

### ii. Other Disparities

Saud points to at least one instance where a similarly situated person was treated better following an OIDE investigation. He argues that Suglia was notified that he could file a counter-complaint against his accuser and was given greater detail about the nature of his policy violation. [Dkt. 218 at 2]. Additionally, Saud was barred from participating in DePaul-sponsored events when Suglia was not. [Dkt. 257 at 14.] Better treatment of people similarly situated but for the protected characteristic is one way to establish pretext. *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). The Court agrees that Saud his identified some evidence of discrimination through different treatment of Suglia, a white professor, following his OIDE investigation. This is not enough to sustain an inference of racial discrimination on its own, but something to add to the pile for consideration as a whole.

---

[19]     Saud argues the Dean premised his decision to bar Saud from future employment on a misunderstanding of Tamburro's October Title IX Report. According to Saud, the Dean interpreted Tamburro's report to mean that OIDE found Saud had done all the things C.M. accused him of doing, including exchanging grades for sex. [Dkt. 266 at 9; Dkt. 224-12 (Velasco Deposition 184:10–187:8).] But the October Title IX Report found in Saud's favor on that allegation. [Dkt. 208-26 at 10.] Whether or not Dean Velasco misunderstood the Title IX report is irrelevant absent evidence that he acted purposefully, or someone else acted purposefully in encouraging that mistake. *See Mullin*, 732 F.3d at 778. Furthermore, mistakenly predicating Saud's discipline on the belief that he agreed to exchange grades for sex is not evidence of race discrimination, which Saud needs to avoid summary judgment. *Stockwell*, 597 F.3d at 901–02; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006).

Saud next argues the outcome of his OIDE investigation was "predetermined" and thus indicative of pretext.[20] For example, he asserts that Tamburro and Keshk attempted to elicit information about other potential accusers, and that neither notified Saud about the other reports.[21] According to Saud, "white faculty are always informed and integrated into investigations." [Dkt. 257 at 10.] But Saud does not cite to any evidence in the record in support of this assertion, and "generalized argument[s] that supervisors treat white employees better than [minority] employees," without support from record, is not sufficient. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 899 (7th Cir. 2018).

Nor is the Court persuaded by Saud's arguments that the outcome of the Title IX investigation was pretextual because he "was punished for something that was not prohibited at DePaul." [Dkt. 242 at 12.] It is true that DePaul's ADAH policy does not explicitly prohibit sexual relationships between professors and students, even while students are currently enrolled in a professor's class. But whether Saud's actions violated DePaul's policy is beside the point (as is the fact that Saud later prevailed in C.M.'s lawsuit). What matters for pretext purposes is whether the relevant decisionmakers honestly believed Saud violated the policy when they made the decision to bar him from future employment. *See Ptasznik*, 464 F.3d at 696 ("An

---

[20]     Saud admits his arguments about insufficient process received during the Title IX investigation relate to his pretext claim. [Dkt. 257 at 16.] Such allegations cannot support a procedural due process claim since that claim was dismissed. [Dkt. 36 at 7; Dkt. 61 at 19.]

[21]     Keshk's testimony about reports made by others is hearsay and inadmissible to show pretext. *See Fall v. New York State United Tchrs.*, 289 F. App'x 419, 421 (2d Cir. 2008) ("[plaintiff must offer specific, admissible evidence of pretext."); *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 n.3 (7th Cir. 2017) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

36

employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held."); *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014) (dispensing with employee's argument that his conduct did not violate his employer's policy because the issue is whether the employer honestly believed it did). Saud has mustered no evidence that the relevant actors and decisionmakers believed his conduct did not violate the policy.

Finally, Saud makes a variety of arguments aimed at showing an "ongoing history of discrimination" at DePaul and within OIDE. *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 858 (7th Cir. 2019). He identifies (sometimes by name) other DePaul employees who were treated poorly (or treated well, if they were white), had their claims of race discrimination ignored, and were targeted by OIDE, including after publication of *Campus Watch* articles. [Dkt. 257 at 16; Dkt. 242 at 13; Dkt. 266 at 2; Dkt 266 at 15; Dkt 224-48].

While "a plaintiff can demonstrate pretext … by presenting evidence of the employer's … practices with respect to minority employment," Saud presents insufficient evidence to impugn DePaul's employment decision with respect to him. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006). Much of Saud's evidence is hearsay, such as Schaffer's testimony that others complained to her that they believed she discriminated against them. [Dkt. 226-17 (Schaffer Deposition 92:6-15).] The remaining evidence—such Schaffer's testimony that an African American professor once brought a noose to her office during an investigation [*Id.*, 92:22-93:1]— is too scant, disjointed, and general "to impugn a particular employment decision."

37

*Ford*, 942 F.3d at 858; *Stinson v. Cnty. of Cook*, 2020 WL 6870816, at \*15 (N.D. Ill. Nov. 23, 2020) (explaining, in retaliation context, that even assuming plaintiff mustered evidence that her employer had a "culture of retaliation" she failed to connect any "general culture of retaliation to" her adverse employment action).

Also insufficient are Saud's passing references to Keshk's belief that Saud would throw him under the bus [Dkt. 226-3 (Keshk Deposition 265:21-266:24)] and how Keshk dismissed as a joke an instance where a peer evaluator commented about Saud having allegiance to Saudi Arabia. [*Id.* at 84:13-88:11.] These assertions are undeveloped and therefore waived. Waiver aside, even taken together, they are too scant to permit an inference of race discrimination.

Considered as a whole per *Ortiz*, 834 F.3d at 764, including DePaul's better treatment of Suglia, the evidence does not "permit a reasonable jury to infer 'an overall likelihood of discrimination' that merits a trial." *Joll*, 953 F.3d at 929 (citing *Ortiz*, 834 F.3d at 763).

## IV. Conclusion

DePaul's Motion for Summary judgment is granted. Saud's Motion for Summary Judgment is denied.

Enter: 19-cv-3945
Date:  December 6, 2024

_____
Lindsay C. Jenkins
United States District Judge