

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 25-1034

LAITH SAUD,

*Plaintiff-Appellant,*

*v.*

DEPAUL UNIVERSITY,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cv-3945 — **Lindsay C. Jenkins**, *Judge.*

———————————

ARGUED SEPTEMBER 5, 2025 — DECIDED OCTOBER 8, 2025

———————————

Before ST. EVE, JACKSON-AKIWUMI, and LEE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. After having sex with a student in his class and being sued by the student for sexual harassment, DePaul University decided not to hire Laith Saud as an adjunct professor and deemed him ineligible for future employment. Saud then sued DePaul for discriminating against him based on his race. The district court granted DePaul's motion for summary judgment, finding DePaul had advanced legitimate, nondiscriminatory reasons for its decisions. Because we

find Saud failed to carry his burden to show that DePaul's reasons were pretext for racial discrimination, we affirm.

## I. Background

Saud, who is Arab American, started working at DePaul in 2005 or 2006 as an adjunct instructor in its Department of Religious Studies. Later he became a term faculty member (a non-tenure track position on annual teaching contracts).

On April 10, 2017, DePaul College of Liberal Arts and Social Sciences Dean Guillermo Vásquez de Velasco informed Saud and another term faculty member in the Department, David Lysik, that due to budgetary constraints, DePaul would not be renewing their contracts for the next year.[1] The next day Department Chair Dr. Khaled Keshk emailed school administrators about retaining Saud and Lysik as adjuncts.

Also on April 10, an attorney sent Saud and DePaul a letter claiming Saud had committed "repeated acts of sexual misconduct … involving" one of his students, C.M. Karen Tamburro, DePaul's Title IX coordinator in its Office of Institutional Diversity and Equity ("OIDE"), opened an investigation into C.M.'s claim. While DePaul does not have a specific policy prohibiting relationships between faculty and students when the student is enrolled in the faculty member's course, its policy provides that "[t]he determination of what constitutes sexual harassment depends upon the specific facts and the context in which the conduct occurs."

Tamburro interviewed Saud, who acknowledged he had had a sexual relationship with C.M. but maintained it was

---

[1] Saud does not challenge this decision.

No. 25-1034                                                3

consensual and began when C.M. was no longer his student. C.M. did not participate in the investigation. On May 9, 2017, Tamburro finalized her report, which concluded there was insufficient evidence to find that Saud engaged in misconduct.

Meanwhile, Saud and Keshk continued to discuss Saud's appointment as an adjunct. In mid-May 2017, Keshk and Saud agreed that Saud would teach two classes. On June 26, the Dean's office told Keshk it was reinstating Saud's adjunct position. On June 28, Keshk asked Saud and Lysik what they thought was "fair" payment. And on July 1, Saud requested $6,000 per course, exceeding the $4,800 per course Keshk had the authority to offer.

On June 29, C.M. filed a lawsuit against Saud and DePaul, alleging that while she was Saud's student, he attempted to get her intoxicated and took her to his home, where he "began to aggressively seek sexual relations with [her]" and had sex with her. She also alleged that Saud told her she would get an A in his class and she did not have to take the final exam.

On July 6, Keshk informed Saud that due to "low projected course enrollment [and] … [Saud's] compensation requirements," he could not offer Saud an adjunct position for the coming fall.

Later that summer, Tamburro informed Saud that OIDE would conduct a second investigation based on the allegations in C.M.'s lawsuit. Saud gave Tamburro the verified answer he filed in C.M.'s lawsuit but declined an interview request this time. Saud's answer admitted he sent C.M. an email asking her for a drink while she was a student in his class, and that he and C.M. had sex. Saud did not deny that the sex occurred while C.M. was his student.

On October 5, Tamburro issued her second report, which found by a preponderance of the evidence that Saud had sexually harassed C.M. She based this finding on inconsistencies between Saud's description of his interactions with C.M. in his OIDE interview and his admissions in his answer to C.M.'s lawsuit.

On October 23, Dean Velasco informed Saud that, based on OIDE's findings, he was no longer eligible for future employment at DePaul, and he could not provide formal or informal instruction in any classroom-based or cocurricular activities sponsored by the school.

In June 2019, Saud sued DePaul and two former DePaul employees, alleging that DePaul violated 42 U.S.C. § 1981 by discriminating against him based on his race, among other claims. Following two amended complaints, the district court dismissed Saud's other claims. After discovery, the district court granted DePaul's motion for summary judgment on Saud's § 1981 claim, reasoning that Saud had failed to raise a genuine issue of material fact as to whether DePaul discriminated against Saud.

Saud appealed.

## II. Discussion

We review de novo a district court's grant of summary judgment. *Vassileva v. City of Chicago*, 118 F.4th 869, 873 (7th Cir. 2024). Construing all facts and making all reasonable inferences in the nonmoving party's favor, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Parkey v. Sample*, 623 F.3d 1163, 1165 (7th Cir. 2010).

No. 25-1034                                                    5

## A. Section 1981 Employment Discrimination

"Section 1981 provides a federal remedy against racial discrimination in private employment." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019). Like Title VII, to succeed on a § 1981 claim, a plaintiff must show membership in a protected class, an adverse employment action, and causation.[2] *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022); *see also Gamble v. County of Cook*, 106 F.4th 622, 625 (7th Cir. 2024) ("The same legal standard applies to claims of racial discrimination under Title VII [and] Section[] 1981 …."). For § 1981 claims, race must have been a but-for cause of the adverse employment decisions. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020); *Lewis*, 36 F.4th at 759.

The fundamental question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Lewis*, 36 F.4th at 760. And, we have emphasized that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

To help answer this question, a plaintiff may invoke the well-known *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *see also Lewis*, 36 F.4th at 759.

---

[2] There is no dispute the first two requirements are met. Here, the dispute is over causation.

First, the plaintiff must make out a prima facie case of employment discrimination by showing he: (1) belongs to a protected class, (2) met the defendant's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who were not members of his protected class. *Lewis*, 36 F.4th at 759.

Second, if the plaintiff satisfies each element, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 760.

Finally, "[t]he burden then shifts back to the employee to show why the employer's explanation is pretextual." *Id.* "Pretext is '[a] lie, specifically a phony reason for some action,' not 'just faulty reasoning or mistaken judgment on the part of the employer.…'" *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025) (quoting *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020)). That is, pretext is not shown when the employer "honestly believed" the reason for its decision. *Anderson v. Street*, 104 F.4th 646, 654 (7th Cir. 2024); *see also Cunningham v. Austin*, 125 F.4th 783, 789–90 (7th Cir. 2025). Nor do we question an honestly held reason. *Cunningham*, 125 F.4th at 789–90.

On appeal, Saud argues the district court erred in granting summary judgment under both *McDonnell Douglas* and *Ortiz*. Neither party disputes that Saud has met the first three requirements of his prima facie case: (1) he is a member of a protected class (he is Arab American), (2) prior to the events at issue, he met DePaul's legitimate expectations, and (3) he suffered adverse employment actions. The parties focus on whether Saud satisfied the fourth step, but we have often said that "[b]ecause the prima facie and pretext inquiry [] overlap, if a defendant offers a nondiscriminatory reason for its

No. 25-1034                                                    7

actions, we can proceed directly to the pretext inquiry."
*Barnes*, 946 F.3d at 389; *see also Upchurch v. Indiana*, 146 F.4th
579, 587 (7th Cir. 2025).

Saud identifies two adverse employment actions: (1) De-
Paul's decision not to employ him as an adjunct and (2) De-
Paul's decision deeming him ineligible for future employ-
ment.[3] In both instances, DePaul offered nondiscriminatory
reasons for its actions. We address each in turn, proceeding
directly to Saud's argument that DePaul's reasons were pre-
text for discrimination based on his race.

**B. Decision Not to Hire Saud as an Adjunct**

DePaul says it did not hire Saud as an adjunct for the Fall
2017 quarter because of the allegations in C.M.'s lawsuit, two
additional reports of potential misconduct, low projected en-
rollment in his courses, and his request for more money than
the Department could pay. Saud argues these reasons are pre-
text for racial discrimination.

First, Saud invokes comparator evidence, which asks the
court to "draw an inference of pretext from evidence that

---

[3] Contrary to Saud's assertion, the district court did not "entirely ig-
nore[]" a third adverse employment action—the Title IX investigation it-
self. Indeed, it correctly rejected his argument that the investigation was
an independent adverse employment action and considered Saud's argu-
ments as part of its pretext analysis. *See Saud v. DePaul Univ.*, No. 19-cv-
3945, 2024 WL 5007833, at *9 n.11 (N.D. Ill. Dec. 6, 2024). For an employ-
ment action to be materially adverse, it must bring "about some 'disad-
vantageous' change in an employment term or condition." *Muldrow v. City
of St. Louis*, 601 U.S. 346, 354 (2024) (quoting *Oncale v. Sundowner Offshore
Servs., Inc.*, 523 U.S. 75, 80 (1998)). While the investigation had down-
stream consequences, Saud has not presented a triable fact about whether
the process meaningfully altered his employment.

[DePaul] treated another employee differently." *Upchurch*, 146 F.4th at 588. He says Lysik, a white man OIDE investigated in 2014 following anonymous allegations of sexual assault posted online, is a suitable comparator DePaul treated more favorably. "When using comparators to demonstrate pretext, a plaintiff must usually 'show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Napier*, 137 F.4th at 894 (citation modified) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). In other words, Saud must establish that "the purported comparator was 'directly comparable to [him] in all material respects' so as to 'eliminate other possible explanatory variables.'" *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 810 (7th Cir. 2025) (citation modified).

But Lysik is not "directly comparable to [Saud] in all material respects." *Id.* (quoting *Gamble*, 106 F.4th at 626). For starters, Saud admitted to having sex with C.M., whereas DePaul admitted it could not identify the accuser in Lysik's case or gather any other information about the allegations. Moreover, Keshk based his decision not to hire Saud on C.M.'s lawsuit, not the first OIDE investigation which cleared Saud. In fact, during and after OIDE's first investigation, Keshk worked with both Saud and Lysik to have them hired as adjunct professors. It was only after C.M. filed her lawsuit (yet another material difference from Lysik's case) that Keshk informed Saud DePaul would not hire him. Although comparators "need not be identical in every conceivable way," *Coleman*, 667 F.3d at 846, Saud's focus on Lysik overlooks these material differences.

No. 25-1034                                                                                                9

Second, Saud claims Keshk's reasons for his decision not to hire Saud were shifting and inconsistent. But to give rise to pretext, "explanations must actually be shifting and inconsistent." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016) (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003)). Merely providing multiple, or additional, reasons for an adverse employment decision does not establish pretext. *See Sweet v. Town of Bargersville*, 18 F.4th 273, 280 (7th Cir. 2021); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015).

Here, Saud first points to supposed inconsistencies between the reasons Keshk gave for Saud's dismissal in his July 2017 email to Saud and at his deposition. At the time, Keshk told Saud he was not being hired due to "low projected course enrollments" and Saud's salary request, but, during his deposition, Keshk said C.M.'s lawsuit and additional reports of Saud's misconduct also factored into his decision. Saud also asserts there is evidence Keshk forwarded Lysik's salary request to the Dean, but no evidence he forwarded Saud's request. Saud says this directly undermines the compensation reason.

None of these amounts to pretext. As the district court found, though Keshk later said that C.M.'s lawsuit and the two additional reports of misconduct also played a role, he never disclaimed the enrollment and budgetary reasons. "Where an employer relies on multiple reasons for the termination, its failure to address *all* of the reasons in *each* communication about the employee is not enough to show contradictions or shifts in rationales that suggest pretext." *Castro*, 786 F.3d at 577.

Further, Keshk's failure to forward Saud's salary request fades as evidence of pretext when viewed in context. Saud's salary request came two days after C.M. filed her lawsuit. And Keshk provided multiple reasons that, working together, led to his decision. Retaining Lysik and forwarding only his salary request to the Dean does not suggest that Keshk lied about compensation being one of several reasons for the decision not to hire Saud as an adjunct—particularly given the backdrop of the lawsuit and the other reports of misconduct Keshk received. Given this context, Keshk's failure to send Saud's salary request to the Dean does not demonstrate such a weakness, implausibility, inconsistency, or contradiction in DePaul's asserted reason amounting to pretext for racial discrimination. *See Parker v. Brooks Life Science, Inc.*, 39 F.4th 931, 938 (7th Cir. 2022) (quoting *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021)).

Third, Saud says DePaul's reasons for its decision are unsupported or contradicted by the evidence. None of Saud's arguments is availing.

Saud claims C.M.'s lawsuit did not provide the basis for DePaul's decision because there is evidence suggesting the University made its decision before C.M. filed her lawsuit. Saud points to the decision in early May 2017 to list his courses as reassigned to "STAFF"—rather than list his name as the instructor—and a June 2017 email from the Dean's office stating that Saud's position "was terminated [but it is being] reinstat[ed] … today."

The very email Saud points to says the school was reinstating Saud's adjunct position. Further, Keshk and Saud communicated throughout May and June, discussing Saud's appointment as an adjunct. It was only after C.M.'s lawsuit that

Keshk informed Saud he would not be hired as an adjunct. And though DePaul's process for delisting Saud's courses may have been "unstructured" and not "accurate, wise, or well-considered," this alone does not show that DePaul's reason was a lie. *Barnes*, 946 F.3d at 390 (quoting *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013)). All is to say, the evidence Saud points to does not suggest DePaul had made a decision prior to C.M.'s lawsuit.

Relatedly, Saud claims DePaul manufactured his low projected course enrollment by listing his courses as assigned to "STAFF" because it knew his classes typically had high enrollment. But Saud's argument wades too far into "mere conjecture and speculation." *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 597 (7th Cir. 2017). He points to no evidence demonstrating that listing a class as "STAFF" violated DePaul procedures or led to the low enrollment. *See Everett v. Cook County*, 655 F.3d 723, 728 (7th Cir. 2011) ("[F]or a jury to be able to infer any impropriety based on an employer's failure to abide by its own procedures, the employee must show that there was an actual procedure in place that served to bind the employer's discretion.").

Saud briefly raises a series of other arguments to demonstrate pretext. For many of the same reasons, they fail. Saud claims, for example, that Keshk acted "in self-interest" because Keshk testified he worried Saud would "throw [him] under the bus" before DePaul administrators. But Keshk's full testimony was that he was worried Saud would "throw [him] under the bus" by "lying to him" about whether the reported misconduct occurred. Even assuming this shows Keshk was dishonest (in many ways, Keshk's testimony *reinforces* his belief in the reasons for the decision), it does not show that

"prohibited animus" motivated Keshk. *Napier*, 137 F.4th at 893 (quoting *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 740 (7th Cir. 2013)). And Saud points to no evidence suggesting his race motivated Keshk.

Ultimately, our inquiry is "[w]hether a reasonable juror could conclude that [Saud] would have [been employed as an adjunct for the fall quarter] if he had a different ethnicity, and everything else remained the same." *Ortiz*, 834 F.3d at 764. Saud has not put forth evidence that meets this inquiry.

## C. Decision Deeming Saud Ineligible for Future Employment

DePaul deemed Saud ineligible for future employment because the second OIDE investigation found by a preponderance of the evidence that Saud sexually harassed C.M. Sexual misconduct is a legitimate, nondiscriminatory reason for an adverse employment action. *See, e.g., Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014); *Swearnigen-El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 861 (7th Cir. 2010).

Moreover, so long as an employer "honestly believed it made the correct employment decision—even if its decision was inaccurate, unfair, foolish, trivial, or baseless—[the] claims cannot succeed." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023) (citation modified); *Upchurch*, 146 F.4th at 587. That is, to establish pretext, Saud must show that Dean Velasco, as the final decisionmaker, "did not honestly believe his reasons for" deeming Saud ineligible for future employment. *Cung Hnin*, 751 F.3d at 507; *see also Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013) ("[W]e evaluate the honesty of the employer's explanation, rather than its validity or reasonableness …."). Saud fails to identify any evidence that

No. 25-1034                                                    13

Dean Velasco did not "honestly believe" he was making the correct employment decision.

Saud's attempt to rely on a comparator for pretext again fails. In addition to pointing to Lysik, who is not a comparator for the reasons already discussed, Saud points to Joseph Suglia, a white professor at DePaul. OIDE and Tamburro investigated Suglia following complaints about "verbal exchanges … of an explicit sexual nature" with a student no longer enrolled in his course. OIDE found that Suglia violated DePaul policy, and Suglia's department chair deemed him ineligible for employment at DePaul.

Like Lysik, Suglia is not a proper comparator. Suglia faced the same sanction as Saud, so DePaul did not treat Suglia more favorably.[4] *See Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 273 (7th Cir. 2023). Additionally, Suglia's department chair, not Dean Velasco, issued the sanction, so Saud and Suglia did not "deal[] with the same supervisor." *Napier*, 137 F.4th at 894; *see Mourning v. Ternes Packaging, Ind., Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (noting comparator requires more favorable treatment "by the same decisionmaker").

Nor can Saud establish pretext through his general assertions of institutional bias. Saud focuses on a January 2017 discussion he hosted titled "Muslim American Civil Liberties in the age of Trump" and an April 2017 "*Campus Watch*" article published about Saud, his Arab American identity, and his

---

[4] Saud disputes that Suglia faced the same sanction because, while Suglia was deemed ineligible for future employment, he was not "banned from participating in DePaul activities." Even if this is a material distinction, it would not establish Suglia as a comparator because Suglia's department head determined his sanction, not the Dean.

political views. Although he asserts DePaul "flagged" him for hosting the event and subsequently launched OIDE's first investigation into him after the *Campus Watch* article came out, Saud does not put forth any evidence that DePaul "flagged" him for the event based on his race (as opposed to, say, his political views). *Cf. Ennin*, 878 F.3d at 597 (explaining that "[w]ithout … any other indicators of racial bias" plaintiff is left with "mere conjecture and speculation" which does not establish pretext). And Saud does not suggest DePaul had anything to do with the *Campus Watch* article, nor does he attempt to connect the article to the OIDE investigation.

Finally, Saud advances a cat's paw theory of liability, trying to impute Tamburro's supposed discrimination to the Dean's decision. This theory applies when "a biased subordinate who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013) (citation modified). But this argument fails because Saud points to no evidence showing that Tamburro was "biased."

Saud claims Tamburro was discriminatory because DePaul did not have a policy prohibiting faculty-student relationships, yet she investigated him following C.M.'s claims and ultimately found that he had violated DePaul policy. But DePaul's policy merely says that such relationships are not per se prohibited, not that they can never amount to misconduct. Indeed, DePaul might have put itself at risk by not investigating the sexual harassment complaints. *See C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 544–45 (7th Cir. 2022). And Tamburro *cleared* Saud of wrongdoing initially, only changing her conclusion once more evidence emerged.

No. 25-1034                                                          15

In any event, we do not evaluate whether an employer's given reason for its decision "was accurate or even whether it was unfair. Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) (quoting *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020)). And, like Dean Velasco, Saud has not shown that Tamburro did not honestly believe Saud violated the policy following her second investigation.

Saud's remaining arguments, that the investigation itself shows discrimination because Saud was not treated as fairly as Suglia and that Tamburro has a history of discrimination generally, are not supported by the evidence. Moreover, these generalized claims do not "undercut the specific justifications given by [DePaul]" for Saud's termination. *Barnes*, 946 F.3d at 390 (quoting *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 858 (7th Cir. 2019)). Any remaining evidence of racial bias is "too scant [and] disjointed," *Saud*, 2024 WL 5007833, at *17 (citing *Ford*, 942 F.3d at 858), and "[g]eneral allegations of an 'ongoing history of discrimination' are not enough to impugn a particular employment decision," *Ford*, 942 F.3d at 858 (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006)).

                              *        *        *

The judgment of the district court is

                                                          AFFIRMED.